Henry J. KIRKSEY et al.,
Plaintiffs,

v.

BOARD OF SUPERVISORS OF HINDS COUNTY et al.,
Defendants.

Civ. A. No. 4939(N).

United States District Court,
S. D. Mississippi,
Jackson Division.

April 25, 1975.

Frank R. Parker, Herman (Tex) Wilson, Lawyers' Committee for Civil Rights Under the Law, Jackson, Miss., for plaintiffs.

Thomas H. Watkins, William A. Allain, John M. Putnam, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

### FINDINGS OF FACT

(1) This action was filed on July 27, 1971, for declaratory and injunctive relief against the Hinds County Board of Supervisors, the Hinds County Election Commission, and the Hinds County Democratic Executive Committee, the named plaintiffs seeking to represent a class of persons composed of "all black citizens in Hinds County, Mississippi, who are registered voters qualified to vote for candidates for the post of county supervisor, justice of the peace, constable and other county officers elected from districts in Hinds County, Mississippi." The plaintiffs, who are black registered voters of Hinds County, alleged that the redistricting of the five supervisors' districts of Hinds County in 1969 violated their rights secured by the Fourteenth and Fifteenth Amendments to the United States Constitution and by 42 U.S.C. Sections 1971, 1973, and 1983, and that this Court had jurisdiction of their claims pursuant to 28 U.S.C. Sections 1343, 1344, 2201 and 2202, and 42 U.S.C. Sections 1971(d) and 1973j(f).[1]

More specifically, the plaintiffs challenged the 1969 Hinds County redistricting plan on the grounds that the defendants were under a duty to submit the plan to the Attorney General of the United States under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. Section 1973c, and had failed to secure the approval of the Attorney General with respect thereto (Count I); that the 1969

---

1. The original plaintiffs were Henry J. Kirksey, whose residence was changed from District Four to District Five under the 1969 plan, and Bennie G. Thompson and George W. Daniel, both residing in District Two before and after the 1969 plan was implemented. This Court has subsequently granted the plaintiffs' motion to amend to add three additional black voters residing in the other three supervisors' districts, and there is thus a named plaintiff residing in each of the five supervisors' districts of Hinds County. (Order dated December 27, 1972).

redistricting was a racial gerrymander drawn with the purpose and effect of diluting Black voting strength in Hinds County (Count II) ; and that the 1969 districts were malapportioned in violation of the one-man, one-vote rule (Count III).

(2) On August 2, 1971, after a hearing thereon, this Court denied the plaintiffs' motion for a preliminary injunction seeking to enjoin the defendants from conducting the 1971 county primary and general elections in Hinds County under this 1969 redistricting plan. Pursuant to the plaintiffs' request, a Three-Judge Court was designated on August 5, 1971, as required under Section 5 of the Voting Rights Act of 1965. On July 6, 1972, the plaintiffs moved for leave to amend their complaint to dismiss Count I, primarily to avoid the duplication brought about by the filing of a complaint by the United States seeking to enforce Section 5 objections to the 1969 redistricting plan in the case of *United States v. Board of Supervisors of Hinds County,* Civil Action No. 4983 (Southern District of Mississippi). This Court granted the motion to dismiss Count I without prejudice and dissolved the Three-Judge Court, thereby leaving plaintiffs' Counts II and III for decision by a single Judge. (Order dated July 31, 1972).

(3) On December 15, 1972, a conference was held in this matter at which time counsel for both plaintiffs and defendants agreed that an order requiring the drawing of a new redistricting plan would obviate the necessity of a determination on the issues raised by Counts II and III of the complaint.

Accordingly, on December 26, 1972, this Court entered an Order, without objection by counsel representing any of the parties herein, which allowed the plaintiffs' Motion for Leave to Amend the Complaint to add additional parties as noted hereinabove; specifically found that there was in fact a good faith effort to redistrict Hinds County in 1969 pursuant to the Order of this Court in *Smith*

*v. Board of Supervisors of Hinds County,* Civil Action No. 4483, decided December 19, 1969; that the five districts of Hinds County had substantially the same number of persons in each district when the redistricting plan of 1969 was ordered implemented; and that subsequent thereto a malapportionment of population or population variances violative of the one-man, one-vote requirement of the Equal Protection Clause of the Fourteenth Amendment had developed among the five supervisors' districts as demonstrated by the 1970 census, published on March 3, 1972 by the Bureau of Census, Department of Commerce.

The defendant Board of Supervisors were therefore directed to file within six months of the date of that Order a new redistricting plan in strict accord with the requirements of the one-man, one-vote rule and the plaintiffs were given thirty days thereafter in which to file objections thereto. This Court's Order further required that "(d) said plan shall be formulated without regard to the race, creed, sex or national origin of any citizen of Hinds County, Mississippi. (e) there shall be incorporated in said plan a description of the election districts thereunder and a designation of the voting places thereunder."

(4) On June 25, 1973, the defendant Board of Supervisors filed a redistricting plan prepared by Comprehensive Planners, Inc. pursuant to this Court's Order of December 26, 1972, and within thirty days thereafter plaintiffs filed a timely objection to this plan. It was the plaintiffs' contention in the objections filed to this 1973 proposed redistricting plan that the plan constituted a racial gerrymander drawn with the purpose and/or effect of minimizing and canceling out black voting strength in the five Supervisors' districts of Hinds County, that the plan deprived black Hinds County voters of the two black majority districts which existed prior to 1969, and that the plan unconstitutionally fragmented and dispersed black population concentrations in the City of Jackson sufficiently populous and compact to form one

or more black majority districts among all five districts, thus diluting black voting strength. The plaintiffs further contended that the proposed districts under the 1973 redistricting plan disregarded natural and geographic boundary lines and political subdivision lines, lacked compactness, preserved incumbents in their respective districts, unnecessarily altered existing precincts, and was based on discriminatory criteria unrelated to proper redistricting and constitutional guarantees.

(5) On January 22, 1974, this Court directed the parties to make efforts to obtain certain racial data with respect to the population of the five districts in question in order to allow this Court to properly consider the merits of the objections raised by the defendants to the 1973 proposed Board plan. Pursuant to that Order, counsel for plaintiffs and defendants employed Comprehensive Planners, Inc. to develop the required information which was admitted into evidence as Plaintiffs' Exhibits 29 through 36, inclusive, at the hearing held in this matter.

(6) On August 1, 1974, after the receipt of the racial statistics provided by the defendants' planning agent showing the racial composition of each of the defendants' proposed districts, the plaintiffs filed a proposed alternative county redistricting plan which was based on "Census Tracts". The defendants contend that the plan submitted by the plaintiffs is wholly impractical and unacceptable in that it is a racially motivated gerrymander and furthermore, that it creates two relatively small districts wholly within the City of Jackson without any county road or bridge mileage included and without any effort to utilize land areas or rural and urban populations.

(7) This action was tried before the Court on August 19 and 20, 1974, the plaintiffs calling four witnesses, Henry J. Kirksey, Dr. James W. Loewen, Dr. Gordon G. Henderson, and Johnny Ross, and presenting approximately seventy documents for introduction into evidence. The defendants called one witness, Mr. Hoyt T. Holland, Jr., and presented approximately four exhibits for introduction into evidence. This Court has subsequently carefully considered the transcript of this proceeding, the exhibits introduced into evidence, and the proposed findings of fact and conclusions of law, and accompanying memoranda of law, presented by the parties in this case in support of their respective positions.

(8) The population of Hinds County, Mississippi is concentrated in and around the City of Jackson, the county seat of the First Judicial District of Hinds County and the capital of Mississippi. The remainder of the county is much less developed and populated, thus resulting in an uneven population distribution. As noted by the Fifth Circuit in the case of *Moore v. Leflore County Board of Election Commissioners,* 502 F.2d 621 (5th Cir. 1974), this is the situation in many areas of the South and presents an extremely complicating factor in any reapportionment equation. The case sub judice is also analogous to *Moore, supra,* in that the black population of Hinds County is most heavily concentrated in forty-eight contiguous, majority black census enumeration districts located in the center of the City of Jackson, containing 58,198 black persons, or 69% of the total black population of Hinds County. (Plaintiffs' Exhibits 37, 38). In *Moore, supra,* close to one-half of the county's blacks, one-fourth of the entire population, were concentrated in a five square mile quadrant of the county seat of the town of Greenwood.

Unlike the situation in *Moore,* however, the majority of the residents of Hinds County are white. According to the 1970 United States census, Hinds County has 214,973 residents, of whom 130,592 (60.75%) are white, 84,064 (39.10%) are black, and 317 (.15%) are of other races. The City of Jackson has 153,968 residents, of whom 92,651

(60.1%) are white, 61,063 (39.7%) are black, and 254 (0.1%) are of other races. (Plaintiffs' Exhibits 37, 38).

(9) The 1973 Hinds County redistricting plan approved by the Hinds County Board of Supervisors discloses the following with respect to the population of the five supervisors' districts prior to the preparation of the proposed plan of the defendants:

| District | Jackson | Remainder | Countywide Total | % | % Variance From "Ideal" |
|---|---|---|---|---|---|
| 1 | 39,073 | 11,889 | 50,962 | 23.7 | +18.53 |
| 2 | 30,656 | 8,357 | 39,013 | 18.2 | −09.26 |
| 3 | 36,145 | 12,507 | 48,652 | 22.6 | +13.16 |
| 4 | 21,050 | 21,960 | 43,010 | 20.0 | +00.04 |
| 5 | 27,044 | 6,292 | 33,336 | 15.5 | −22.46 |
| TOTALS | 153,968 | 61,005 | 214,973 | 100.0 | |
| AVERAGE | | | 42,994.6 | | |

(Plaintiffs' Exhibit 22, Table 1, page 5).

———◆———

(10) The 1973 proposed Hinds County redistricting plan submitted by the Board further reveals that as a result of redistricting, the population of the five supervisors' districts of Hinds County would be as follows:

| District | Jackson | Remainder | Total | % | % Variance From "Ideal" |
|---|---|---|---|---|---|
| 1 | 31,059 | 11,889 | 42,948 | 20.0 | −0.11 |
| 2 | 34,704 | 8,357 | 43,061 | 20.0 | +0.15 |
| 3 | 30,692 | 12,507 | 43,199 | 20.1 | +0.48 |
| 4 | 21,050 | 21,960 | 43,010 | 20.0 | +0.04 |
| 5 | 36,463 | 6,292 | 42,755 | 19.9 | −0.56 |
| TOTALS | 153,968 | 61,005 | 214,973 | 100.0 | |
| TOTAL SPREAD | | | | | 1.04 |

(Plaintiffs' Exhibit 22, Table 1, page 5).

———◆———

(11) The plaintiffs' proposed alternative plan submitted herein on August 1, 1974, reveals that as a result of redistricting under their plan, the population of the five supervisors' districts of Hinds County would be as follows:

| District | Total Population | Population Difference From Norm | Percent Variance From Norm |
|---|---|---|---|
| 1 | 42,002 | −993 | −2.31 |
| 2 | 43,055 | + 60 | +0.14 |
| 3 | 43,664 | +669 | +1.56 |
| 4 | 43,329 | +334 | +0.78 |
| 5 | 42,923 | − 72 | −0.17 |
| TOTAL SPREAD | | | 3.87 |

(Plaintiffs' Exhibit 46, page 2).

(12) Thus, like the Court in *Moore, supra,* this Court has before it two separate proposed plans which divide Hinds County into five districts of practically equal population. Both plans clearly satisfy the one-man, one-vote standard established by *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the 1.04% and 3.87% variance between the largest and smallest districts in both the defendant's and plaintiffs' plans, respectively, being well within the judicially established guidelines. It is thus encumbent upon this Court to examine each plan to determine its constitutional validity, and thereafter order the implementation of one of the submitted plans, or if warranted, direct the preparation of an additional plan.

(13) Pursuant to this Court's Order of December 26, 1972, the defendant Board of Supervisors employed Comprehensive Planners, Inc. (C.P.I.) to prepare and submit an acceptable redistricting plan for Hinds County. Comprehensive Planners is a corporation organized on April 2, 1966 at West Point, Mississippi, to provide services to public bodies in the field of political redistricting and reapportionment. Its professional staff includes specialists in urban and regional planning, urban renewal, urban design, economic and demographic research, property re-evaluation, and political redistricting and apportionment. Mr. Hoyt Holland, Jr., Vice President of C.P.I. and the individual in charge of special planning in political redistricting plans, testified at the hearing held in this matter on August 19 and 20, 1974. Holland has testified before this Court in several cases concerning proposed redistricting plans, including *Howard v. Adams County Board of Supervisors,* Civil Action No. 1352 (decided July 20, 1971), and *Bassett v. Roberts,* Civil Action No. J74–135(N) (this Court having this date ordered the preparation of a new plan by the Smith County Board of Supervisors), and the Court considers him an expert in the field of special planning in political redistricting. (See Exhibit D–1).

(14) Upon receipt by C.P.I. of the contract to prepare a new redistricting plan for Hinds County, it carefully examined the 1969 plan then in effect, which it had prepared pursuant to the Order of this Court on July 18, 1969 in *Smith v. Hinds County Board of Supervisors,* Civil Action No. 4483, and approved by the Court on December 19, 1969. Based upon this examination, C.P.I. made the preliminary determination that the equalization of population between districts, which it considered to be of primary importance, could be satisfactorily accomplished by changes in the boundary lines within the City of Jackson, thereby preserving, so far as possible, the equalization of road and bridge mileage and land area accomplished by the 1969 plan. This would also prevent any disturbance of existing district boundaries, voting precincts and voting places in the rural areas of the county. (Holland testimony—Trs. 373, 374, 377; Exhibit P–22, page 9).

(15) Utilizing this approach, C.P.I. was able to draft a plan with only a 1.04 per cent variance between the largest and smallest districts, as noted hereinabove, which substantially retained intact the previously existing election districts and equalized road mileage and land area. Holland testified that only seventeen election districts within the urban area of Jackson would be disturbed by the proposed Board plan, there being no proposed changes in election districts outside the City of Jackson, and two of these changes would involve only land area and not people. Additionally, he noted that under the proposed plan four election districts would be shifted from one supervisors' district to another without any change in boundary, and approximately nine other districts required minor changes in their boundaries occasioned by the expansion of the city limits of Jackson in August of 1971. (Holland testimony—Trs. 386, 387; Exhibit P–22, pages 11, 12).

(16) Holland testified that C.P.I., in the preparation of the 1973 Board plan, did not attempt to make a second sur-

vey of the road mileage but used the maps and surveys they had previously prepared for the 1969 plan. He further stated that it was his understanding from a meeting with the Board of Supervisors that there had been no substantial changes in the rural areas in any particular district between 1969 and 1973 and that the road mileage, bridge and maintenance responsibility area were satisfactory to all members of the Board. Holland noted that in attempting to equalize the responsibilities of the supervisors in regards to road and bridge maintenance, it was necessary to consider not only the road mileage and the number of bridges, but also the types of roads and bridges contained within a particular district. He further testified that the C.P.I. staff are not experts in the road and bridge maintenance field and relied on the judgment of the supervisors on that subject, in addition to the actual road mileage and total number of bridges in attempting to equalize the responsibilities. (Holland testimony—Trs. 385).

A comparison of the new districts under the proposed Board plan with respect to road mileage, using a norm of 20%, reveals that District One has the lowest percentage of total actual mileage, 17.2%; District Two—20.5%; District Three—21.8%; District Four—20.3%; and District Five—20.2%. (Holland testimony—Trs. 285; Exhibit P–22, page 10).

The square mile area comparison of the proposed districts of the Board plan, with a norm of 20%, would be as follows: District One—15.9%; District Two—23.6%; District Three—21.1%; District Four—18.0%; and District Five—21.4%. (Exhibit P–22, page 10).

A comparison of the number of bridges contained within each of the proposed districts under the Board plan, with a norm of 55%, is as follows: District One—43%; District Two—46%; District Three—70%; District Four—46%; District Five—68%. (Exhibit P–26, page 6).

Although the plaintiffs have presented for the Court's consideration a statistical comparison of the road mileage in each district under the pre-1969 plan, the 1969 plan, and the 1973 plan, and a comparison of the land area in square miles between the 1969 plan and the 1973 plan, this Court does not find the disparities presented to be of any great significance. (Exhibit P–13, page 6; Exhibit P–26, page 6). They result from the necessary consideration of population equalization as the primary goal in drawing the 1973 Board plan.

Furthermore, it is clear from the evidence that the equalization of road mileage and land area has always been a legitimate concern of the Board of Supervisors in attempting to equalize responsibilities among the five districts. This Court concurs with the defendants' interpretation of the entry in Minute Book 88, page 238 (Exhibit P–45), concerning possible conversion to a county-unit system in Hinds County, that although the County Engineer would be given certain general duties in regards to the maintenance of roads and bridges in all districts, the individual members of the Board would retain supervision with respect to their particular district. (Trs. 139–142).

(17) This Court has carefully examined the Board plan prepared by C.P. I., the testimony of Holland in regard to that plan and the preparation thereof, and finds that the Board plan does achieve the primary goal of a reapportionment plan of equality of population within constitutional guidelines, while at the same time equalizing as nearly as practical under the circumstances the important subsidiary factors of road and bridge mileage and land area, assigning to each district substantial numbers of both urban and rural residents. This result is accomplished under the Board plan with a minimal disturbance or change of existing election districts and voting places.

(18) The plaintiffs are critical of the Board's proposed plan's utilization of long corridors into the City of Jackson from the rural land mass in order to achieve the required equalization of population. As noted by Holland in his testimony before this Court, it is absolutely impossible to draw five districts without splitting the urban area of Jackson into five parts and still realize the other desirable planning objectives of equalization of road and bridge maintenance responsibilities and the substantial equalization of areas between the districts.[2]

Certainly, as the plaintiffs suggest and as has been true with other plans considered by this Court, the utilization of the long corridors into an urban area does create rather unusual looking supervisors' districts. In this case, as was true in the Adams County case, the plaintiffs have quite appropriately referred to proposed District Three as a "turkey" and proposed District Four as a "baby elephant". This Court has carefully examined these lines, however, and finds that they do follow, so far as possible, natural boundaries such as rivers, highways, railways, and other landmarks traditionally used to designate district boundaries. (Exhibit P–22, pages 13–106).

In redistricting a county with the configuration of Hinds, the vast majority of its population situated in the northeastern corner of the county in the urban area of Jackson, it was absolutely necessary and proper, in this Court's opinion, to have corridors running into Jackson from each rural land mass in order to achieve a division of population and approximate equalization of

road mileage and land area. In this regard, we concur with the observation of the Court in *Moore v. Leflore County Board of Election Commissioners, supra,* in discussing the irregularities of the boundary lines presented by the Court approved plan therein, the Court noting: "the lines of all districts are well within the bounds of reasonable discretion and do not offend good planning. The criticism that some districts are not compact because of relatively lengthy perimeters is without factual or logical support, considering the physical conditions that prevail." 361 F.Supp. 603 at 611.

(19) Plaintiffs further criticize the proposed Board plan because it divides among the five districts of the county heavily populated black areas within the City of Jackson. The plan necessarily divides the people of the City of Jackson, both black and white, among the five districts and this was necessary, in this Court's opinion, in order to achieve equalization of population with approximate equalization of road mileage and land area. This Court finds no substantial evidence of fragmentation of any particular area within the county containing a majority of either the black or white population other than that which naturally occurred in attempting to equalize population while considering other legitimate planning objectives.

(20) Holland testified that pursuant to the December 26, 1972 Order of this Court and the specific instructions he received from the Board of Supervisors of Hinds County in that regard, he did not give any consideration to the race, creed, sex or national origin of any of the citizens of Hinds County in the preparation of the proposed 1973 Board plan. (Holland testimony—Trs. 370).

---

2. The constitutional objections to the use of long corridors reaching into and segmenting a city to achieve population balance was discussed by the Fifth Circuit in *Moore v. Leflore County Board of Election Commissioners, supra,* the Court reaffirming its statements in *Howard v. Adams County Board of Supervisors, supra,* that "with its land area largely rural, and its population concentrated in one urban area, the realization of these legitimate planning objectives dictated a plan which would consolidate urban and rural areas into each district . . . ". 453 F.2d 455 at 456.

He further stated that when work was begun on the 1973 plan the statistician and staff member in his office who dealt with the compilation of the population statistics in drawing the lines was specifically instructed to "deal only with the total population figures from the computer printout sheets and other census data and to disregard entirely any racial figures whatsoever . . .." (Holland testimony—Trs. 403, 404).

Holland testified that his first compilation of any racial data concerning the 1973 plan was in response to the Order of this Court in January, 1974, subsequent to the preparation and submission of the plan the preceding year. (Holland testimony—Trs. 389).

In computing the population of Hinds County for the purpose of devising the 1969 redistricting plan, C.P.I. did engage in actual house count in the rural areas of Hinds County and in the City of Jackson, and this procedure included different house count factors for white and non-white houses. Holland testified that prior to the availability of the 1970 census data the only way C.P.I. could reasonably accurately estimate population in an economically feasible manner was to use the population per household factors. (Holland testimony—Trs. 418). This witness was examined extensively concerning the utilization of this procedure in the preparation of the 1969 plan, and the Court is convinced that this procedure was the most efficient means possible of computing accurate total population percentages at that particular time. (Holland testimony—Trs. 417–423).

The record is devoid of any evidence whatsoever that the racial data compiled in order to compute the population totals was used in any manner whatsoever by C.P.I. in order to draw the 1969 plan along racial lines in order to disperse or dilute the black vote.

▮ Based on the findings hereinabove, this Court is of the opinion that the plan prepared by C.P.I. and presented by the Hinds County Board of Supervisors to this Court for approval was devised in order to achieve population equality and approximate equalization of road and bridge mileage and land area. This Court further finds that this was accomplished without regard to race or political affiliation of the residents of the county, race being wholly disregarded as a factor in fashioning the district lines for both the 1969 plan and the 1973 plan.

(21) The official 1970 census of population for Mississippi indicates the following population, by race, for Hinds County and for each of the five supervisors' districts as defined by the boundaries in existence prior to the 1969 redistricting, with population reflecting 1970 statistics as reported by the United States Bureau of Census:

| Hinds County | Total White | Percent White | Total Black | Percent Black | Total Other | Percent Other |
|---|---|---|---|---|---|---|
| | 130,592 | 60.75 | 84,064 | 39.10 | 317 | .15 |
| Dist. 1 | 54,292 | 53.69 | 46,674 | 46.16 | 157 | .16 |
| Dist. 2 | 1,705 | 23.74 | 5,477 | 76.26 | 0 | 0 |
| Dist. 3 | 1,705 | 31.89 | 3,631 | 67.92 | 10 | .19 |
| Dist. 4 | 37,875 | 62.64 | 22,490 | 37.19 | 99 | .16 |
| Dist. 5 | 35,015 | 85.70 | 5,792 | 14.18 | 51 | .12 |

(Plaintiffs' Exhibits P–37, P– 38).

As revealed by the above figures, prior to the redistricting in 1969, blacks in Hinds County comprised the majority in two supervisors' districts, Districts Two (2) and Three (3).

(22) The statistical data developed pursuant to this Court's Order of January 22, 1974, reveals the following with respect to the racial composition of the districts under the 1969 redistricting plan:

| District Number | White | Non-White | Total | W/NW Percent |
|---|---|---|---|---|
| 1 | 32,377 | 18,564 | 51,031 | 63.4/36.6 |
| 2 | 21,940 | 17,004 | 38,944 | 56.3/43.7 |
| 3 | 29,000 | 19,652 | 48,652 | 59.6/40.4 |
| 4 | 29,260 | 13,750 | 43,010 | 68.0/32.0 |
| 5 | 17,974 | 15,362 | 33,336 | 53.9/46.1 |
| TOTAL | 130,551 | 84,422 | 214,973 | 60.7/39.3 |

(Plaintiffs' Exhibit P–30).

The racial composition of supervisors' districts under the defendants' 1973 proposed redistricting plan is as follows:

| District Number | White | Non-White | Total | W/NW Percent |
|---|---|---|---|---|
| 1 | 30,289 | 12,695 | 42,948 | 70.5/29.5 |
| 2 | 20,077 | 22,984 | 43,061 | 46.6/53.4 |
| 3 | 31,237 | 11,962 | 43,199 | 72.3/27.7 |
| 4 | 29,260 | 13,750 | 43,010 | 68.0/32.0 |
| 5 | 19,689 | 23,066 | 42,755 | 46.0/54.0 |
| TOTAL | 130,552 | 84,421 | 214,973 | 60.7/39.3 |

(Plaintiffs' Exhibit P–30).

The above statistical breakdown of racial distribution of the population in Hinds County reveals that under the 1973 redistricting plan prepared by C.P. I., blacks are in the majority in Districts Two (2) and Five (5), whereas blacks were not in the majority in any district under the 1969 redistricting plan. The Court considers this quite a significant factor in a county in which blacks comprise less than forty per cent of the total population of the county.

(23) It is necessary, however, for this Court to also consider the racial distribution of voting age population. Dr. James W. Loewen, Associate Professor of Sociology at Tougaloo, Mississippi, with a specialization in urban sociology, race relations, political science, and Mississippi history (see Exhibit P–53), testified that due to the heavier out-migration of adult blacks from Hinds County, the percentage of blacks in the black voting age population of the county is disproportionately less than the percentage of whites in the white voting age population. Utilizing a statistical analysis of the estimated voting age population (V.A.P.) by race, Dr. Loewen's testimony revealed that 84,064 blacks living in Hinds County, 37,988 (45.2%) are under eighteen years of age, leaving a black voting age population of 46,072, or 34.19% of the total voting age population. Of the 130,592 whites living in Hinds County, 41,895 (32.1%) are under eighteen years of age, leaving a white voting age population of 88,697, or 65.-81% of the total voting age population. Thus, pursuant to Dr. Loewen's calculations, the percentage of blacks in the total voting age population of Hinds County (34.19%) is five percentage points *less* than the percentage of blacks

in the total population of the county (39.10%). However, the percentage of whites in the total voting age population of Hinds County (65.81%) is five per- centage points *more* than the percentage of whites in the total population (60.- 75%). (Loewen testimony; Exhibit P– 54).

Based on these computations, the estimated voting age population of each of the defendants' proposed districts, by race, is as follows:

| District | White VAP | Percent White VAP | Black VAP | Percent Black VAP |
|---|---|---|---|---|
| 1 | 20,566 | 74.7 | 6,957 | 25.3 |
| 2 | 13,632 | 52.0 | 12,595 | 48.0 |
| 3 | 21,210 | 76.5 | 6,555 | 23.5 |
| 4 | 19,868 | 72.5 | 7,535 | 27.5 |
| 5 | 13,369 | 51.4 | 12,640 | 48.6 |

(Loewen testimony; Exhibit P–54).

———————◆———————

Dr. Loewen noted on cross-examination that in computing the above statistics, he was in fact assuming that the 34.19 percentage of blacks in the total voting age population in Hinds County would be the same in each of the five districts. He further noted that because of this the percentage by districts would be only estimates but "they were very unlikely to be off more than, I would say, one or maybe two percentage points. Maybe one and a half" (Loewen testimony—Trs. 249–250). An upward variance of several percentage points, however, would place the percentage of blacks in the voting age population in Districts Two and Five at approximately fifty per cent of the total V.A.P.

Dr. Loewen's conclusion that blacks do not comprise a majority of the voting age population in any district is confirmed to some extent by the calculations of Dr. Gordon Henderson, Director of the Computer Center and Professor of Political Science at Tougaloo College, who the Court recognized as an expert in the field of political science, and more specifically political behavior and political attitudes, but not in the field of county redistricting. (Exhibit P–58). Basing his calculations upon United States Census data for Jackson city blocks and Hinds County enumeration districts, Dr. Henderson determined that the black voting age population under the Board plan is approximately 47% of the total voting age population of defendants' proposed Districts Two and Five. (Henderson testimony—Trs. 326). He further testified that the percent of the black voting age population within the City of Jackson under the Board plan is approximately 45% in District Two and approximately 46% in District Five. (Exhibits P–61, 64).

A review of Dr. Henderson's testimony reveals that he was also necessarily required to utilize certain estimates, particularly with regard to areas outside the City of Jackson, and he noted that his determinations in regard to Districts Two and Five were "tolerably reliable". (Henderson testimony—Trs. 324–325, 326, 341, 342). Thus, upward variances of several percentage points in Dr. Henderson's computations would also place the percentage voting population of blacks within District Two and District Five at approximately 50% of the total voting age population.

■ (24) The plaintiffs sought, through the testimony of Dr. Loewen, to present evidence concerning the estimated voter registration by race in each of the proposed districts under the Board plan. The 1971 study by the Institute of Politics at Millsaps College on which this

witness based his testimony, however, was not available for introduction at the hearing and this Court sustained the defendants' objection to his testimony. Dr. Loewen's calculations, based on the I.O.P. Study, presented by offer of proof, revealed that he estimated 41.7% and 41.2% of the voters in Districts Two and Five, respectively, were black. (Trs. 217–224). Even assuming the correctness of these calculations, the Court is of the opinion, as was found by this Court to be the case in *Howard v. Adams County Board of Supervisors, supra,* that the sole reason for non-registration of blacks in Hinds County ten years after the passage of the Voting Rights Act is a lack of interest or complete apathy.

(25) Plaintiffs point out, however, that prior to the 1969 redistricting of Hinds County, blacks were in substantial majority in Districts Two and Three in total population and presumably voting age population. This fact loses a great deal of its significance, however, because of the fact that prior to 1969, District Two had a population of only 7,082 persons and District Three had a population of only 5,346 persons, whereas each of these districts should have had almost 43,000 people in order to comply with the one-man, one-vote requirement.

(26) This Court has carefully considered the evidence presented by the plaintiffs in their attempt to establish the proposition that the process leading to nomination and election are not equally open to blacks in Hinds County, including, inter alia, the fact that no black has ever been elected to the Hinds County Board of Supervisors or any other office in Hinds County (Exhibit P–24, page 32; testimony of Henry Kirksey);

the retention of the poll tax as a requisite to voting in this State until 1966; the retention until 1966 by this State of a literacy test as a requisite to registration, Mississippi Constitution § 244, as amended in 1954, implemented in Mississippi Code Ann. § 3213 (1956 Recomp.); the conditioning of primary participation on adherence to party principles, and successive adoption of alleged segregation principles by party organizations; the requirement that a member of the Board of Supervisors be a resident freeholder of the district which he represents and the owner of real estate therein valued at $1500, coupled with the fact that a much larger percentage of blacks in Hinds County fall below the census poverty lines as opposed to whites, Mississippi Code Ann. § 19–3–3 (1972); Exh. P–3, page H–1); the designation in 1965 of Hinds County for the use of federal examiners pursuant to § 6 of the Voting Rights Act of 1965, 42 U.S.C. § 1973d, and the subsequent registration pursuant thereto; the disqualification of certain black candidates by the Hinds County Election Commission and exclusion of their names from the general election because they had voted in the August 1967 Democratic primary in violation of the 1966 Amendment to Mississippi Code Ann. § 3260 (1956 Recomp. Pocket Part), which was thereafter held unenforceable because of the failure of its submission pursuant to Section 5 of the Voting Rights Act and was subsequently objected to by the Attorney General;[3] the testimony of Dr. Loewen, based on 1970 census data, concerning the disproportionate educational, employment and income level and living conditions between whites and blacks in Hinds County, and the effect on blacks'

3. Although the deposition of Mr. Pottinger, and the Exhibits thereto, was admitted into evidence for purposes of revealing grounds for the objection by the Attorney General to plans prepared by Holland in other counties in this State (Trs. 454–456), this Court sustained the objection to its introduction with regard to any objection filed by the Attorney General to the 1969 Board plan on the ground of relevancy. The 1969 plan was a court-ordered plan and did not, as will be noted hereinafter, require submission to the Attorney General for approval pursuant to Section 5 of the Voting Rights Act. Furthermore, the question of whether the plan required submission or was submitted is not before this Court, Count I of the Complaint in this case having been dismissed voluntarily by the plaintiffs. (Trs. 33–38).

ability to register and vote and to run as candidates for office; the allegedly high rate of block voting by whites and blacks in Hinds County; and several electoral mechanisms presently operative in elections in Hinds County, including the requirement of a majority vote as a prerequisite to party nomination and winning a special election, Mississippi Code Ann. §§ 23–3–69; 23–5–203; 23–5–197 (1972); the prohibition against single shot voting, Mississippi Code Ann. § 3110 (1956 Recomp.); and the requirement of at-large elections of county election commissioners, Mississippi Code Ann. § 23–5–3 (1972), all of which the plaintiffs contend exclude blacks from equal opportunity to participate and win elections in Hinds County.

(27) Furthermore, this Court has carefully considered the evidence presented by the plaintiffs in their attempt to establish a lack of responsiveness on the part of white elected officials in Hinds County, including, inter alia, the findings by this Court and others of systematic exclusion of blacks from jury lists in the First and Second Judicial Districts of Hinds County, *Love v. McGee*, 297 F.Supp. 1314 (S.D.Miss.1968); *Goode v. Cook*, 319 F.Supp. 246 (S.D. Miss.1969), and *Spencer v. State*, 240 So.2d 260 (Miss.1970); the support and maintenance of the Board of Supervisors by tax levy of two allegedly racially segregated agricultural high schools and juniors colleges within Hinds County, Hinds Junior College and Utica Junior College, and an alleged disproportionate funding of these colleges (Minute Book 55, page 277, Exh. P–45); the appointment of only white persons as members of the County Board of Public Welfare in Hinds County (Minute Book 56, page 608; Minute Book 74, page 214; Kirksey Testimony); the failure of the Board of Supervisors to provide funds for the Community Hospital for Negroes of Jackson (Minute Book 56, page 681); the authorization of an ad valorem tax exemption for Jackson Academy, Inc., an allegedly racially segregated private school maintained for the purpose of providing an alternative to the public school desegregation (Minute Book 60, pages 25–26 and passim); and the maintenance and levying of taxes in support of a dual school system in Hinds County prior to 1965 by the Board of Supervisors, in conjunction with the Hinds County Board of Education and the Board of Trustees of the Jackson Municipal Separate School District, the Board of Education members being elected from each of the supervisors' districts and the Board of Trustees being appointed by the Jackson City Council [*Singleton v. Jackson Municipal Separate School District*, 348 F.2d 729 (5th Cir. 1965); 355 F.2d 865 (5th Cir. 1966); 419 F.2d 1211 (5th Cir. 1969), rev'd, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970); 425 F.2d 1211 (5th Cir. 1970); 426 F.2d 1364 (5th Cir. 1970); 430 F.2d 368 (5th Cir. 1970); 432 F.2d 927 (5th Cir. 1970), and *United States v. Hinds County School Board*, 402 F.2d 926 (5th Cir. 1968); 417 F.2d 852 (5th Cir. 1969), cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 531 (1969); 423 F.2d 1264 (5th Cir. 1969)].

(28) Although there have been instances of racial discrimination against blacks in Hinds County in the past, they were not peculiar to Hinds County, but have existed in many counties in this State and, we venture to say, throughout the entire country. Furthermore, the evidence presented by the plaintiffs hereinabove is not new to this Court, but has been reviewed numerous times in other cases. In fact, a significant portion of the above evidence is the result of actions by this Court and other courts in this State.

One fact which this Court deems significant, however, in again reviewing this evidence, is that the vast majority of what this Court considers the more severe allegations of racial discrimination occurred a number of years ago. For example, the poll tax has been abolished in this State since 1966 and this

Court doubts that many young voters are even aware that it once existed. There is absolutely no evidence in this record that any person has been denied the right to register to vote or to vote because of his race since the enactment of the Voting Rights Act in 1965. In fact, over 12,-379 eligible blacks have been registered by federal examiners since October 8, 1965, according to the testimony of Mr. Major C. McDaniel, State Supervisor, Voting Rights Program, U. S. Civil Service (Exhibit P–21). As heretofore noted, this Court is of the opinion that the failure of any black citizen to register to vote in Hinds County at this time, is caused by a lack of interest or complete apathy on his part. The school system of Hinds County and the City of Jackson have been operating under Court order since the mid-1960's and the effects of the operation of a dual school system in Hinds County prior to that time have long since diminished or disappeared.

This Court tried the case of *Love v. McGee,* supra, and determined in 1968 that a prima facie case of discrimination in the jury selection process was established by the statistical data presented, which was not adequately refuted by the defendants. Subsequent to that case, however, we do not find any actions or non-actions on the part of white elected officials evidencing racial discrimination or a lack of responsiveness on their

part to the economic, social or political interest of the black community. On the contrary, this Court has witnessed over the past seven years a willingness on the part of Hinds County officials to seek equitable solutions to racial problems. This is particularly true in the case sub judice, the Order entered by this Court on December 26, 1972, directing the preparation of a new plan specifically finding that there was a good faith effort to redistrict Hinds County in 1969 and that subsequent thereto, malapportionment had developed among the districts. This finding was agreed to by counsel representing the plaintiffs at that time, the only matter in dispute being the requirement of new elections after the preparation of a plan, which the Court denied.

This Court does not find that any of the electoral laws presently in effect in Hinds County or this State operate to make it more difficult for blacks to equally participate in the electoral process. Likewise, the proof offered by the plaintiffs, in this Court's opinion, does not establish that any disproportionate educational, employment and income levels or living conditions existing at this time between whites and blacks in Hinds County has a significant effect on the ability of blacks in this county to register and vote or to run as a candidate for office.[4]

4. This Court has carefully examined the testimony of Drs. Loewen and Henderson, together with the appropriate exhibits to their testimony concerning the existence of a pattern of racial block voting by whites and blacks in Hinds County. The plaintiffs presented persuasive evidence that such a pattern does in fact exist in Hinds County, particularly the testimony and documentary evidence of Dr. Henderson, relating to a study of the 1971 general election in this State (P–59) and his correlation analysis of the votes received by the white and black candidates in the 1971 general election in certain designated precincts within the City of Jackson. Dr. Henderson's analysis revealed that, on a correlation scale of −1.0 to +1.0, in which a correlation of +0.35 would be significant, the correlation for whites voting for white candidates is +0.979, while the

correlation for blacks voting for black candidates is +0.957. (Henderson Testimony; P–65).

There do exist, however, inconsistencies and a certain incompleteness in the study and analysis made by Dr. Henderson concerning racial block voting in the entire county, thus clouding its effect on the prospects of a black candidate or a candidate favored by the black voters, winning an election in the two proposed supervisors' districts containing a majority of the total population of blacks.

Initially the study made by Dr. Henderson was limited to seventy-seven precincts within the City of Jackson, and did not include a study of any of the precincts outside the City. Furthermore, Dr. Henderson did not satisfactorily explain, in this Court's opinion, why the percentage of voter turnout in Precinct Two, one of two predominantly black

There is a point in time when past instances or examples of racial discrimination become remote—a time when a past history becomes a remote history. That time has arrived for Hinds County. The mistakes of the early 1960's and prior to that time do not, in this Court's opinion, have any significant effect on the nomination and election of Hinds County officials in 1975.

The test to be applied by this Court in determining the dilution issue is:

"whether the plan, combined with a past history of racial discrimination and present political realities, gives minority group members 'less opportunity than . . . other residents in the district to participate in the political processes and to elect legislators of their choice,' . . . [citation omitted] . . . The rule is a judicial recognition of what common sense commands—that the effect or impact of a redistricting plan cannot be evaluated accurately when considered in isolation but only when examined against the backdrop of racial discrimination in the community, past and present." *Gilbert v. Sterrett,* 509 F.2d 1389 (5th Cir. 1975) (dissenting opinion).

(29) This Court finds that although there have been past instances of discrimination against blacks in Hinds County, and throughout this State, blacks are not excluded in 1975 from effective participation in the electoral system, there being no convincing evidence in this case that black citizens are denied access to the political process or hindered in any way from engaging in significant political activity, or otherwise discouraged from seeking political offices in Hinds County. Furthermore, plaintiffs have failed to prove any lack of responsiveness on the part of white elected officials, the contrary being true.

The plaintiffs have failed to prove by the convincing evidence that their voting strength will be minimized or canceled out in any way by the Board plan, in which blacks constitute a majority of the population in two districts. In view of the possible variances in the computations of the voting age population in District Two and District Five, coupled with the heretofore noted inconsistencies in predicting block voting patterns in Hinds County, the Board plan offers black residents of this county, who constitute less than 40% of the total population, a realistic opportunity to elect officials of their choice, whether white or black, in two supervisors' districts and to significantly affect the election of county officials in the three remaining districts.

(30) Plaintiffs have proposed an alternative redistricting plan which equalizes the population of Hinds County among the five proposed districts and fully complies, as heretofore noted, with the one-man, one-vote constitutional requirement. The plaintiffs' proposed districts are based exclusively on the use of census tracts as "building blocks", combining contiguous census tracts into equally populous districts. Plaintiffs contend that the advantages in utilizing census tracts in the development of a redistricting plan are as follows: tract boundaries are established cooperatively by a local committee and the Bureau of Census rather than the plaintiffs, thus preventing gerrymandering; population figures for census tracts are published by the Bureau of Census as determined

---

districts utilized by him in his analysis, dropped or decreased from 1972 to 1973, 24.2% to 9.9%, and from 1971 to 1972, 28.7% to 24.2%, even though there was an effective choice between white and black candidates both in 1971 and in 1973. This same situation occurs with sample Precinct 20. (Henderson Testimony—Trs. 335–339).

Finally, this Court considers the fact that there was an increase in the white voter turnout in 1972 when there were three white candidates, over 1971 when there was a major black candidate, Charles Evers, and two white candidates, and yet a decrease in 1973 over 1972 in white voter turnout when there was a black and white candidate opposing each other, completely inconsistent with Dr. Henderson's block voting or racial pollerization theory. (Henderson Testimony—Trs. 342–346).

by the Dicentennial Census headcount of the population, thus utilizing the best available population statistics in providing for equally populous districts; the use of census tracts aid long-range planning for social and economic development of the county because they are maintained over longer periods of time and the Bureau of Census tabulates population and social, economic and housing characteristics for each census tract; and tracts are designed to be relatively uniform with respect to population characteristics, economic status and living conditions (see Exhibits P–46, P–3).

(31) The racial composition of the supervisors' districts under the plaintiffs' proposed plan would be as follows:

| Proposed District | Total Population | White | Percent White | Black | Percent Black | Others |
|---|---|---|---|---|---|---|
| 1 | 42,002 | 35,739 | 85.09 | 6,191 | 14.73 | |
| 2 | 43,055 | 29,017 | 67.40 | 13,958 | 32.42 | |
| 3 | 43,664 | 14,601 | 33.44 | 29,002 | 66.47 | |
| 4 | 43,329 | 13,648 | 31.50 | 29,620 | 68.36 | |
| 5 | 42,923 | 37,587 | 87.57 | 5,293 | 12.33 | |
| TOTALS | 214,973 | 130,592 | 60.75 | 84,064 | 39.10 | 317 |

(Plaintiffs' Exhibit P–46, page 5).

As is readily discernible from the above statistical data, the plaintiffs' plan creates three majority white districts, Districts 1, 2 and 5, and two majority black districts, Districts 3 and 4. This result would be unchanged if the above computations were converted to show racial distribution of the voting age population (V.A.P.).

(32) This Court has carefully examined this alternative redistricting plan, prepared by the plaintiffs' attorney, Mr. Frank Parker, including the testimony of Henry J. Kirksey, the plaintiff herein, who testified in favor of the plan, although the Court determined that he was not an expert in the field of redistricting, and the testimony of Hoyt Holland, who testified for the defendants in opposition to the plan (Trs. 135–149, 392–403).

Based upon this examination, the Court is of the opinion that the plaintiffs' plan deliberately and designedly combines those census tracts having the heaviest concentration of the black population in the City for the sole purpose of creating two safe black majority districts in Hinds County. This constitutes an intentional racial gerrymander of the black population of Hinds County and the plan is thus not constitutionally permissible.

(33) Under the plaintiffs' proposed alternative plan, Districts Three and Four are entirely within the City of Jackson and the supervisors elected therefrom would have few, if any, duties relative to the construction or maintenance of roads or bridges within their respective districts. Conversely, Districts One, Two and Five would be burdened with substantially all of the duties and responsibilities with respect to the county roads and bridges outside of the municipality. District Two, under the plaintiffs' proposed plan, would have approximately 853 miles of county maintained roads in the county, or approximately 58%. Furthermore, the plaintiffs' alternative plan would not have both urban and rural representation in Districts Three and Four, a factor this Court deems important in any redistricting plan.

Thus, although the plaintiffs' alternative plan does achieve equality of population within constitutional guidelines, it

makes no attempt, and in fact wholly fails, to take into consideration or accomplish what this Court considers to be important subsidiary factors of attempting to equalize road and land area. Although the plaintiffs attempted to show that an approximate equalization of county maintained road mileage and land area among the districts is not necessary in Hinds County in order to have efficient county government, this Court is of the opinion that the plaintiffs' proof falls far short in this regard.

At the hearing held in this case on August 19 and 20, 1974, the Court reserved ruling on the admissibility of Plaintiffs' Exhibits 5, 6, 9, 10, 12, 13 and 16, presently marked for identification only. These Exhibits are hereby admitted into evidence and shall be marked accordingly.

### CONCLUSIONS OF LAW

(1) This Court has jurisdiction of the parties and of the subject matter of this cause pursuant to 28 U.S.C. Section 1343 and 42 U.S.C. Sections 1971(d) and 1973j(f).

(2) This is a proper class action pursuant to Rule 23(a) and (b)(2), F.R.Civ.P., the plaintiff class being defined as "all black citizens in Hinds County, Mississippi, who are registered voters qualified to vote for candidates for the post of county supervisor, justice of the peace, constable, and other county officers elected from districts in Hinds County, Mississippi." The five named plaintiffs, each of whom reside in one of the five supervisors' districts of Hinds County, have standing to bring this action and fully and adequately represent the interest of the class defined hereinabove.

(3) The two redistricting plans presented to this Court dividing Hinds County into five separate districts of practically equal population clearly satisfy the arithmetical requirement of the one-man, one-vote standard established by *Reynolds v. Sims*, 377 U.S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964); the

1.04 per cent and 3.87 per cent variance between the largest and smallest districts in both the Board's plan and the plaintiffs' plan, respectively, falling within the judicially established guidelines of *Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), and its progeny.

(4) In order to establish the existence of an unconstitutional reapportionment plan, in the absence of malapportionment, it is necessary for the plaintiffs to maintain the burden of showing either (1) a racially motivated gerrymander, or a plan drawn along racial lines, *Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); *Howard v. Adams County Board of Supervisors*, 453 F.2d 455 (5th Cir. 1972), or (2) "that . . . designedly or otherwise, a[n] . . . apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population." *Burns v. Richardson*, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Howard v. Adams County Board of Supervisors, supra; Moore v. Leflore County Board of Election Commissioners*, 502 F.2d 621 (5th Cir. 1974). In other words, if plaintiffs cannot show a racial gerrymander, they must prove "that the political processes leading to nomination and election [would not be] equally open to participation by the group in question— that its members [would have] less opportunity than [would] other residents in the district to participate in the political process and to elect legislators of their choice." *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973). See *Turner v. McKeithen*, 490 F.2d 191 (5th Cir. 1974); *Moore v. Leflore County Board of Election Commissioners, supra*.

In *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (En Banc), the Court stated, ". . . The Supreme Court has identified a panoply of factors, any number of which may contribute to

the existence of dilution. Clearly, it is not enough to prove a mere disparity between the number of minority residents and the number of minority representatives." Although some of the factors discussed in *Zimmer* are applicable only to multimember districts, certain general factors should be considered in cases where it is contended that the dilution of a racial group's voting strength has been caused by a shifting of precinct boundaries, the Court noting:

"Where a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a continuous state policy underlying the preference for [the established] districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. . . . The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in *White v. Regester*, supra, demonstrates, however, that all these factors need not be proved in order to obtain relief." 485 F.2d at 1305; See *Robinson v. Commissioner's Court, Anderson County*, 505 F.2d 674 (5th Cir. 1974); *Turner v. McKeithen*, 490 F.2d 191, 194 (5th Cir. 1973). See also *Reese v. Dallas County, Ala.*, 505 F.2d 879 (5th Cir. 1974).

■ (5) The equalization of road mileage and land areas between the various districts in any redistricting plan are "legitimate planning objectives". *Howard v. Adams County Board of Supervisors, supra.* The fact that an apportionment plan may satisfy some legitimate governmental goals, however, does not immunize it from constitutional attack on the ground that more fundamental criteria is offended. *Robinson v. Commissioners Court, Anderson County*, 505 F.2d 674 (5th Cir. 1974).

(6) Based upon this Court's determination that the plan prepared by C.P.I. was devised to achieve population equality and approximate equalization of road and bridge mileage and land area and that this was done without regard to the race or political affiliation of the residents of the county, race being wholly disregarded as a factor in fashioning the district lines, this Court concludes as a matter of law that the plaintiffs have failed to meet the burden of proving that the new district boundaries were drawn by or for the defendants on racial lines or that the defendants or C.P.I. were motivated by considerations of race, creed, or national origin in creating the new districts. The plaintiffs have failed to prove a racial gerrymander in the drawing of the Board plan. *Gilbert v. Sterrett*, 509 F.2d 1389, (5th Cir. 1975); *Robinson v. Commissioners Court, Anderson County, supra; Moore v. Leflore County Board of Election Commissioners, supra; Howard v. Adams County Board of Supervisors, supra; Wright v. Rockefeller, supra.*

■ (7) Based on this Court's determination that although there have been instances in the past of discrimination against blacks in Hinds County and throughout the State of Mississippi, at the present time, blacks are not precluded from effective participation in the election system, there being no convincing evidence in this case that black citizens are denied access to the political and electoral process or hindered in any way from engaging in significant political activity, or otherwise discouraged from seeking political offices in Hinds County; and this Court's finding that the plaintiffs have failed to prove an unresponsiveness on the part of white elected officials to their particular interests, and that the black voting strength in Hinds County is not minimized or cancelled out by the 1973 Board plan, but on the contrary, the Board plan offers black residents of Hinds County who constitute less than 40% of the total population thereof, a realistic opportunity to elect officials of their choice, whether they be white or black, in two supervisor's districts and significantly affect the elec-

tion of county officials in the three remaining supervisors' districts, leads to the legal conclusion that black residents of Hinds County do not have less opportunity than other residents in the district to participate in the political processes and elect persons of their choice to office. Accordingly, under the circumstances of this particular case, the Board plan would not, either designedly or otherwise, operate to minimize or cancel out the voting strength of the minority black residents of Hinds County. *White v. Regester, supra; Burns v. Richardson, supra; Howard v. Adams County Board of Supervisors, supra; Turner v. McKeithen, supra; Moore v. Leflore County Board of Election Commissioners, supra; Robinson v. Commissioners Court, supra;* and *Gilbert v. Sterrett, supra.*

(8) On the other hand, the redistricting plan submitted by the plaintiffs herein fails to meet the basic requirements applicable to county redistricting as recognized by this Court in *Howard v. Adams County, supra,* and the Court

in *Moore v. Leflore County Board of Election Commissioners, supra,* and in the Fifth Circuit's affirmance of these cases. Furthermore, the plaintiffs' proposed redistricting plan constitutes an intentional gerrymandering of the black voters in Hinds County for the sole purpose of creating two safe majority black districts to insure the election of black county officials. This is constitutionally impermissible and plaintiffs' proposed alternative plan is therefore rejected by this Court. *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).[5]

(9) A reapportionment plan is not unconstitutional merely because its lines are not drawn to insure representation of a particular racial, ethnic, economic or religious group. *Whitcomb v. Chavis,* 403 U.S. 125, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). The plaintiff class, as a minority race, is not entitled to elect any specific number of representatives based on their percentage makeup of the total population.[6]

5. The case of *Robinson v. Commissioners Court, Anderson County,* 505 F.2d 674 (5th Cir. 1974) is factually distinguishable from the case sub judice. In that case the Court did approve a plan which created a black majority district in the town of Palestine with evidently unequal rural road mileage and land area compared to the other districts.

In *Robinson,* the Court noted that the effort to obtain equalization of responsibility for rural road mileage was of recent vintage in Anderson County and, in the Court's opinion, was brought about merely as "an excuse for perpetuating a governing body unrepresentative of the black citizenry." In this case, this Court has specifically found that the equalization of road mileage and land area has always been a concern and a legitimate concern of the Board of Supervisors in an attempt to equalize responsibility between the five districts. In fact, the amount of miles of county-maintained roads in the pre-1969 plan and the 1969 plan and the 1973 plan does not vary substantially between the various districts, and this Court has found that the variances occurred in order to achieve the primary goal of equalization of population.

Furthermore, the Court in *Robinson* noted that there was "no suggestion in the record that the rural precinct boundaries, which as the district court found, followed neither cen-

sus district nor logical boundaries—could not easily have been adjusted to equalize population and road mileage without gerrymandering in Palestine." This Court has determined that the 1973 Board plan is not a racially motivated gerrymander and that the lines between the various districts do, in fact, recognize natural boundaries. Furthermore, the Board plan does not result in an unconstitutional fragmentation of areas of heavy black concentration in Hinds County.

Finally, the Court in *Robinson* found that the evidence was uncontradicted that the Commissioner's Court's apportionments ignored all census data regarding population distribution in making the 1973 adjustments to the 1969 plan, relying instead on voter registration statistics. This, of course, resulted in an unjustified population deviation among the precincts reaching 11%. No such deviation is present in the Board plan in this case and the evidence is uncontradicted that C.P.I. utilized proper census data in drawing the new lines for the 1973 plan.

6. In *Whitcomb v. Chavis, supra,* the United States Supreme Court significantly stated: "The District Court's holding, although on the facts of this case limited to guaranteeing one racial group representation, is not easily contained. It is expressive of the more gen-

In the recent case of *Gilbert v. Sterrett,* 509 F.2d 1389 (5th Cir. 1975), the Fifth Circuit, in affirming the district court's finding that the plan under attack therein was not racially motivated and did not operate to dilute, minimize or cancel out the voting strength of any minority group, significantly stated:

"What counsel for plaintiffs-appellants asked on oral argument was a remand with direction that the Commission redistrict itself once more, this time so that the majority of voters in at least one district be Blacks. That would be contrary to the settled rule that 'a minority is not constitutionally entitled to an apportionment structure designed to maximize its political advantage.' *Turner v. McKeithen,* supra, 490 F.2d at 197."

The contention of the plaintiffs in the case sub judice, although denied, essentially is the same as that of the plaintiffs-appellants in *Gilbert, supra,* i. e., that unless a reapportionment plan is drawn so as to guarantee the election of one or more members of a minority race, commensurate with that minority's percentage makeup of the total population within a county, then there has been a racially motivated gerrymander or an unconstitutional dilution of that minority's voting strength. This is contrary to the established law in this Circuit and the implementation of such a plan is not constitutionally required. See *Howard v. Adams County Board of Supervisors,* 453 F.2d 455, 458 (5th Cir. 1972).

■ (10) This Court concludes that its approval of the 1973 Board plan for Hinds County satisfies all requirements of federal law and the United States Constitution and does not require submission to the Attorney General of the

United States, or approval by the United States District Court for the District of Columbia, because this Court's Order is not within the reach of Section 5 of the Voting Rights Act. *Connor v. Johnson,* 402 U.S. 690, 692, 91 S.Ct. 1760, 29 L. Ed.2d 268, 270 (1971); *Zimmer v. McKeithen,* 467 F.2d 1381 (5th Cir. 1972); *Sheffield v. Itawamba County Board of Supervisors,* 439 F.2d 35 (5th Cir. 1971); *Conner v. Board of Supervisors of Oktibbeha County, Miss.,* 334 F.Supp. 280 (N.D.Miss.1971); *Moore v. Leflore County,* supra.

Accordingly, the defendants shall submit an Order, approved as to form by all counsel, approving and adopting the 1973 Board plan for the redistricting of Hinds County and directing that it be put into effect immediately.

---

eral proposition that any group with distinctive interests must be represented in the legislative halls if it is numerous enough to command at least one seat and represents the majority living in areas sufficiently compact to constitute a single-member district. This approach would make it difficult to reject claims of Democrats, Republicans, or members of any political organization in Mar-

ion County who live in what would be safe districts in a single-member district system but who in one year or another, or year after year, are submerged in a one-sided multi-member district vote. There are also union oriented workers, the university community, religious or ethnic groups occupying identifiable areas of our heterogeneous cities and urban areas."