Henry J. KIRKSEY et al., Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

BOARD OF SUPERVISORS OF HINDS COUNTY, MISSISSIPPI, et al., Defendants-Appellees.

No. 75–2212.

United States Court of Appeals, Fifth Circuit.

May 31, 1977.

Rehearing Denied July 25, 1977.

140

Frank R. Parker, Lawyers' Comm. for Civil Rights Under Law, Herman Wilson, Jackson, Miss., for plaintiffs-appellants.

Jessica Dunsay Silver, Atty., App. Section, U. S. Dept. of Justice, Washington, D. C., for amicus curiae.

Thomas H. Watkins, John M. Putnam, William A. Allain, Jackson, Miss., for defendants-appellees.

\* Because of, illness Judges Wisdom and Thornberry did not participate in the hearing or in the consideration of this case.

1. Members of the Board of Supervisors (the county governing body), justices of the peace, constables, and members of the county Board of Education.

Before BROWN, Chief Judge, GEWIN, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY, GEE, TJOFLAT and HILL, Circuit Judges.\*

GODBOLD, Circuit Judge:

This case concerns the establishment by a court-ordered plan of voting districts for the election of county officers elected by single-member districts in Hinds County, Mississippi.[1] Hinds County is the situs of Jackson, the state capital.

In 1975 the district court approved and adopted a redistricting plan proposed by the county Board of Supervisors.[2] Plaintiffs appealed, and this court affirmed.[3] We granted the petition of plaintiffs for rehearing en banc and heard oral arguments. The court en banc reverses the panel decision, reverses the district court, and remands the case for further consideration.

The facts are extensively discussed in the opinions of the district court and the panel of this court. Only a summary is necessary.

In 1969 Hinds County's electoral districts were reapportioned under court order to bring them in line with the "one-man, one-vote" requirements of *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). In 1971 this suit was filed as a class action on behalf of black registered voters qualified to vote for the county officers elected by districts. Plaintiffs challenged the 1969 apportionment plan on the grounds that it lacked Justice Department preclearance required by § 5 of

2. *Kirksey v. Board of Supervisors of Hinds County,* 402 F.Supp. 658 (S.D.Miss., 1975).

3. *Kirksey v. Board of Supervisors of Hinds County,* 528 F.2d 536 (CA5, 1976).

the Voting Rights Act,[4] unconstitutionally diluted the voting strength of black citizens of Hinds County and malapportioned the county in terms of one-man, one-vote requirements.[5]

The results of the 1970 census became available and they revealed that the 1969 plan malapportioned the county. The district judge ordered the county supervisors to submit a plan of reapportionment, drawn up without regard to race, which created districts equal in population. In 1973 the supervisors submitted a plan prepared by a firm which provides services to public bodies in the field of political redistricting and reapportionment. The plan divided the county into five single-member supervisors' districts of almost equal population. Each district was a long corridor radiating outward from the City of Jackson, broader in the rural land mass perimeter, narrower in the Jackson urban area.

The rural district lines of the 1969 plan were retained, and redistricting was carried out by altering lines within the City. The black community of Hinds County is largely concentrated in the central city area of Jackson. Each corridor cuts into this concentrated black area. Under the plan there would be two Districts, 2 and 5, with black population majorities of 53.4% and 54%, but with smaller percentages of blacks considered on the basis of voting age population.

The general population of the county is 214,973 persons, 60.75% white, 39.10% black. Sixty-nine per cent of the blacks in the county reside in the central city area of Jackson in 48 contiguous census enumeration districts. Of the 63,267 persons residing in these census districts, 58,198, or 92%, are black. The racial distribution of general population and voting age population of the county is:

| District | General population | | Voting age population | |
|---|---|---|---|---|
| | White | Black | White | Black |
| 1 | 70.5% | 29.5% | 74.7% | 25.3% |
| 2 | 46.6% | 53.4% | 52% | 48% |
| 3 | 72.3% | 27.7% | 76.5% | 23.5% |
| 4 | 68% | 32% | 72.5% | 27.5% |
| 5 | 46% | 54% | 51.4% | 48.6% |

These voting age population figures are from the testimony of witness Dr. Loewen. Another witness, Dr. Henderson, approximated the percentage of black voting age population in District 2 to be 45% and District 5 to be 46%.

The plaintiffs challenged the plan, objecting to both its purpose and its effect, and offered their own plan as a substitute.[6] The district court required that it be furnished statistical data showing the racial composition of the districts. After receiving this data the court conducted an evidentiary hearing in August 1974. The vice-president of the firm which prepared the supervisors' plan testified that pursuant to the order of the court requiring the supervisors to present a plan and in accordance with specific instructions of the supervisors to his firm, the plan was drawn in a racially neutral manner. 402 F.Supp. 666–67. The court found that:

> The plan . . . was devised in order to achieve population equality and approximate equalization of road and bridge mileage and land area. This Court further finds that this was accomplished without regard to race or political affiliation of the residents of the county, race being wholly disregarded as a factor in fashioning the district lines for both the 1969 plan and the 1973 plan.

*Id.* at 667. In its conclusions of law the district court held that plaintiffs had failed to meet the burden of proving that the new

---

4. 42 U.S.C. § 1973c.

5. A three-judge court was convened as required by the Voting Rights Act. Plaintiffs dismissed their claims arising under this Act. The three-judge court was dissolved, leaving the plaintiffs' constitutional claims to be heard by a single judge.

6. The U.S. Department of Justice as amicus curiae originally challenged the 1973 plan on the ground that it lacked § 5 preclearance. However, both the plaintiffs and the Department of Justice now conceded that under the authority of *East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), a court-ordered reapportionment plan is not subject to the clearance requirements contained in 42 U.S.C. § 1973c.

district boundaries were drawn by or for the defendants on racial lines or of proving that the defendants or the draftsman of the plan was motivated by considerations of race, creed, or national origin in creating the new districts.

The court approved and adopted the supervisors' plan and directed that it be put into effect. It rejected plaintiffs' alternate plan. On appeal this court, through its panel decision, 528 F.2d 536, affirmed the district court. The court en banc reverses the district court on both constitutional and non-constitutional grounds and remands the case to the district court for the fashioning of a remedy.

## I. The law of unconstitutional reapportionment

American citizens are entitled to participate fully and effectively in the political processes of state legislative bodies.

[R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less.

*Reynolds v. Sims,* 377 U.S. 533, 565, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506, 529 (1964). The same principles apply to county bodies. As the Supreme Court said in *Avery v. Midland County, supra:*

When the State apportions its legislature, it must have due regard for the Equal Protection Clause. Similarly, when the State delegates lawmaking power to local government and provides for the election of local officials from districts specified by statute, ordinance, or local charter, it must insure that those qualified to vote have the right to an equally effective voice in the election process. If voters residing in oversize districts are denied their constitutional right to participate in the election of state legislators, precisely the same kind of deprivation occurs when the members of a city council, school board, or county governing board are elected from districts of substantially unequal population.

390 U.S. at 480, 88 S.Ct. at 1118, 20 L.Ed.2d at 51.

■ However, redistricting done to comply with one-man, one-vote requirements may impinge upon the right of members of minorities to legal access to the processes of democracy. A redistricting plan is constitutionally impermissible as racially discriminatory if it is a racially motivated gerrymander or if it perpetuates an existent denial of access by the racial minority to the political process.[7] With respect to whether in the affected area a racial minority is denied full and effective access to the democratic process:

The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*White v. Regester,* 412 U.S. 755, 766, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314, 324 (1973). As a matter of pure semantics it can be argued that a minority is denied equality of access to the political process if it does not have representation in proportion to its voting strength. With anything less its strength is minimized, cancelled out, or "di-

---

7. *Zimmer v. McKeithen,* 485 F.2d 1297, 1304 (CA5, 1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976); *Robinson v. Commissioners Court,* 505 F.2d 674, 677 (CA5, 1974); *Moore v. Leflore County Bd. of Election Commissioners,* 502 F.2d 621, 623–24 (CA5, 1974).

luted." The Supreme Court and this circuit have consistently eschewed such a mechanistic approach.[8] "[C]learly it is not enough to prove mere disparity between the number of minority residents and the number of minority representatives." *Zimmer v. McKeithen,* 485 F.2d 1297 at 1305 (CA5, 1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).[9]

We noted in *Zimmer,* 485 F.2d at 1305, that the Supreme Court in *White v. Regester,* had identified several factors indicative of denial of access to the political process. Among these are: a history of official racial discrimination which touched the right of the minority to register and vote and to participate in the democratic process, 412 U.S. at 766, 93 S.Ct. 2332, 37 L.Ed.2d at 325; a historical pattern of a disproportionately low number of minority group members being elected to the legislative body, *id.;* a lack of responsiveness on the part of elected officials to the needs of the minority community, 412 U.S. at 769, 93 S.Ct. 2332, 37 L.Ed.2d at 325–26; a depressed socioeconomic status which makes participation in community processes difficult, 412 U.S. at 768, 93 S.Ct. 2332, 37 L.Ed.2d at 325–26; and rules requiring a majority vote as a prerequisite to nomination, 412 U.S. at 766, 93 S.Ct. 2332, 37 L.Ed.2d at 324.[10] While these standards were developed for use in situations involving multimember districts, they have equal application to redistricting schemes making use of single-member districts, such as the plan presently before this court. *Robinson v. Commissioners Court,* 505 F.2d 674, at 678 (CA5, 1974); *Howard v. Adams County Board of Supervisors,* 453 F.2d 455, at 458 n. 2 (CA5), *cert. denied,* 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (1972). By proof of an aggregation of at least some of these factors, or similar ones, a plaintiff can demonstrate that the members of the particular group in question are being denied access.

The court must then look to the matter of whether the redistricting plan, whether adopted by legislative processes or proposed to be adopted and ordered by the court, will continue in effect an existent denial of access to the minority. Both the Supreme Court and this circuit have firmly held that where a reapportionment plan is formulated in the context of an existent intentional denial of access by minority group members to the political process, and would perpetuate that denial, the plan is constitutionally unacceptable because it is a denial of rights guaranteed under the Fourteenth and Fifteenth Amendments.[11]

## II. Denial of access to the political process in Hinds County

As proof of denial of access to the Hinds County political process, the plaintiffs presented substantial unrefuted evidence showing a past record of racial discrimination engaged in by the county and

---

**8.** *White v. Regester,* 412 U.S. 755, 765, 93 S.Ct. 2332, 37 L.Ed.2d 314, 324 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 29 L.Ed.2d 363, 379 (1971); *Zimmer v. McKeithen, supra,* 485 F.2d at 1305.

**9.** The recent Supreme Court decision in *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), is not to the contrary. The Court's remarks on proportionality as a prime measure were made in the context of § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, and not in the constitutional context. As Justice Stewart said, "it is important to note at the outset that the question is not one of constitutional law, but of statutory construction." 425 U.S. at 139, 96 S.Ct. at 1363, 47 L.Ed.2d at 638.

**10.** Some courts have equated minority access to the political process with access of the individual to the ballot box or voting booth. We find this interpretation unpersuasive. The Court in *White v. Regester* would not have bothered to set forth a panoply of factors to gauge access to the political process if access meant only whether every individual could vote. Moreover the factors themselves are more relevant to whether a group has input into the political decision-making process than to whether a particular individual is free to vote.

**11.** *White v. Regester, supra,* 412 U.S. at 766, 93 S.Ct. 2332, 37 L.Ed.2d at 324 (1973); *Whitcomb v. Chavis, supra,* 403 U.S. at 149, 91 S.Ct. 1858, 29 L.Ed.2d at 379 (1971); *Zimmer v. McKeithen, supra,* 485 F.2d at 1305.

of official unresponsiveness to the needs of the county's black citizens. A summary of this evidence is in the district court's opinion, 402 F.Supp. at 670–71, and is reproduced as an Appendix to this opinion. We will not restate it but briefly note that it included the existence of these factors: no black's ever having been elected to Hinds County office; poll taxes and literacy tests as impediments to voting; segregation principles adopted by political parties; property ownership requirements to run for offices; disproportionate education, employment, income level and living conditions between whites and blacks in Hinds County; alleged bloc voting; requirement of a majority for election; prohibition against single-shot voting; systematic exclusion of blacks from juries; levy and maintenance of taxes for a dual school system. In short plaintiffs proved the presence in Hinds County of almost every significant factor indicative of denial of access to the political process. Under this evidence it was not possible to reach any conclusion other than that there had existed in Hinds County racial discrimination and official unresponsiveness to the needs of black citizens. This litany of past history—much of it relating to official action—also commands a conclusion that in significant aspects it was purposeful and intentional. The pattern is clear and stark, and is unexplainable on any grounds other than race.[11a] It would be disingenuous to even suggest that this past history sprang from benign or neutral motives.

While recognizing this record of the past the district court took the approach that the record was not proved to be an accurate reflection of current conditions.

> There is a point in time when past instances or examples of racial discrimination become remote—a time when a past history becomes a remote history. That time has arrived for Hinds County. The mistakes of the early 1960's and prior to that time do not, in this Court's opinion, have any significant effect on the nomination and election of Hinds County officials in 1975.

> \*    \*    \*    \*    \*    \*

> This Court finds that although there have been past instances of discrimination against blacks in Hinds County, and throughout this State, blacks are not excluded in 1975 from effective participation in the electoral system, there being no convincing evidence in this case that black citizens are denied access to the political process or hindered in any way from engaging in significant political activity, or otherwise discouraged from seeking political offices in Hinds County. Furthermore, plaintiffs have failed to prove any lack of responsiveness on the part of white elected officials, the contrary being true.

402 F.Supp. at 673. For several reasons this approach, and the conclusions drawn through the use of it, cannot stand. First, the court's approach required plaintiffs to come forward with evidence that the record of the past continues to be representative of the present. In other circumstances the mere passage of time might be of sufficient duration to permit an inference that what was true in the past is no longer true. In such a case the plaintiff might be required to prove that conditions remain unchanged. Here the past official actions have been sweeping and pervasive. And the focus is on a period from the mid and late 1960's to the early 1970's. This is not such a span that, with any hope of accuracy, one can infer from the mere passing of time that, as the district court put it, "a past history becomes a remote history." Once plaintiffs established a past record of racial discrimination and official unresponsiveness which required the conclusion that at least until a short number of years past they had been denied equal access to the political processes of the county, it then fell to the defendants to come forward with evidence that enough of the incidents of the past had been re-

---

11a. See discussion *infra* of indicia of motive and intent set out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

moved, and the effects of past denial of access dissipated, that there was presently equality of access.[12] The defendants did not come forward with substantial evidence.

■ Second, the court imposed an improper burden of proof of causal relationships. The Supreme Court and this court have recognized that disproportionate educational, employment, income level and living conditions tend to operate to deny access to political life. In this case the court held that these economic and educational factors were not proved to have "significant effect" on political access in Hinds County. It is not necessary in any case that a minority prove such a causal link. Inequality of access is an inference which flows from the existence of economic and educational inequalities.

■ Third, the district court considered specific indicia which it felt demonstrated that the "lack of access' of the past had become "equal access" in the present. These indicia will not bear the weight which the court put on them. The court referred to post-1966 registration of black voters and concluded that any black not currently registered has failed to register because of lack of interest or apathy. This conclusion is not supported by sufficient evidence. It is not a matter for judicial notice.[13] Similarly, on the issue of present unresponsiveness by white elected officials, the court noted that it had tried a case in 1968 concerning discriminatory jury selection methods [14] and that since that time it had found no actions or non-action by elected officials indicating discrimination or lack of responsiveness but rather a willingness to seek equitable solutions to racial problems. This observation by the court is not supported by evidence in the record. Also, and this is highly significant, the specific matters to which the court referred as indi-

12. The Supreme Court and the lower federal courts have followed this approach in other areas of desegregation. *Swann v. Charlotte-Mecklenburg Bd. of Education*, 402 U.S. 1, 26, 91 S.Ct. 1267, 28 L.Ed.2d 554, 572 (1971) (district with a history of school segregation, burden on school authorities to justify a plan which contemplated the existence of some or all schools predominantly of one race); *Keyes v. School District No. 1*, 413 U.S. 189, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548, 564 (1973) (school system with a history of intentional segregation in any portion of the system has burden of proving that any existing segregated schooling is not also the result of intentionally segregative acts); *Chambers v. Hendersonville City Bd. of Education*, 364 F.2d 189, 192 (CA4, 1966) (school system which historically practiced racial discrimination, burden on school board to justify discharge of a disproportionately large number of minority teachers); *Barnes v. Jones County School District*, 544 F.2d 804 (CA5, 1977) (school system with immediately past history of racial discrimination, burden on it to justify demotion and discharge of black teacher).

*Cf. Whitfield v. Oliver*, 399 F.Supp. 348 (M.D. Ala., 1975) (three-judge court) which held that the defendant state officials violated the equal protection clause of the Constitution by setting the aid levels in the predominantly black Aid for Dependent Children program at 35% of "need" as opposed to 100% of "need" funding for the predominantly white Old Age Assistance Program. The court noted:

"The history of the efforts of Negroes in Alabama to become full and free participants in the political processes of the state is recorded at length in the decisions of the federal courts.

\* \* \* \* \* \*

"This extensive and extended history of exclusion of blacks from the Alabama political and governmental system causes the explanation of the defendants—that the disparity in the treatment of welfare programs is a result of "just politics"—to be of no legal effect as an explanation. To the contrary, such an explanation, when read against the march of history, reaffirms our conclusion that there was a discriminatory purpose and effect in the treatment of AFDC. Many of the obstacles that Alabama once placed in the way of full-fledged participation by its black citizens in the political life and government of the state have been removed. We would be naive to decide this case under a pretense that those obstacles never existed." 399 F.Supp. 355, 357.

13. Failure to register may be, for example, a residual effect of past non-access, or of disproportionate education, employment, income level or living conditions. Or it may be in whole or in part attributable to bloc voting by the white majority, i. e., a black may think it futile to register.

14. In which plaintiffs made out a prima facie case of discrimination that defendants were unable to refute.

cia of the demise of non-access are matters in which elected officials acted to stop discrimination as a result of court orders or of federal legislation, such as desegregation, jury discrimination and reapportionment. To the extent that this evidence tends to prove anything, it is that litigation was required to remove discrimination in these important areas, and that litigation has worked. It does not tend to show that discrimination which is not the subject of litigation has been voluntarily removed.

Finally, this court has recognized the lasting impact of historical policies of racial discrimination and official unresponsiveness.[15] We addressed this point in *Zimmer*, when, in response to the very argument advanced by the district court in the instant case, we said:

> Concededly, these impediments to participation in the electoral process have since been removed. The district court concluded that their removal vitiated the significance of the showing of past discrimination. This conclusion is untenable, however, precisely because the debilitating effects of these impediments do persist.

485 F.2d at 1306. Whether the residual effects of past patterns—as opposed to the practices themselves—have been dissipated is a matter for proof, not conjecture. There is no substantial evidence that the residual effects of the past no longer exist in Hinds County. To the contrary, the absence of black elected officials in a county where approximately 35% of the voting population is black is an indication that access of blacks to the political processes of the county is not yet unimpeded.

In summation, the plaintiffs established a long-existent history of sweeping and pervasive denial of access to the democratic political process and of official unresponsiveness to the needs of blacks. The trial court mistakenly placed upon plaintiffs the burden of coming forward with evidence that the long-existent and recent history was still current history at the time of trial. It erroneously placed on plaintiffs the obligation of proving a causal relationship between educational and economic deficiencies and the denial of access to political life. And, to the extent that there is evidence in the record tending to show that the structure and the residual effects of past denial of access have been swept away, it is not substantial enough to support a conclusion that the black minority now has equal access to political life. With the evidence viewed under correct standards, one must infer that the past conditions have not sufficiently changed to eliminate the historical denial of access.

■ Having dealt with past denial of access and its continuation to the present, we turn to the matter of official purpose or intent. Evidentiary indicia of racially discriminatory purpose or intent may, of course, arise in connection with the preparation of a redistricting plan. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). The district court found that there was no improper motive by the draftsman, and that finding is not plainly erroneous. The court also found that the supervisors' motives were neutral with respect to the drawing of the plan, i. e., the plan was devised in order to achieve population equality and approximate equalization of road and bridge mileage. In the narrow context of the drawing of the plan, this was not plainly erroneous,[15a] but it was too narrow. The court did not address whether the plan perpetuated existent purposeful and intentional discriminatory denial of access, because it had erroneously concluded that the past denial of access had attenuated and no present denial existed. Where a plan, though itself racially neutral, carries forward intentional and purposeful discriminatory denial of access that is already in effect, it is not constitutional. Its benign nature cannot insulate the redis-

---

15. *See also, e. g., Robinson v. Commissioners Court, supra*, 505 F.2d at 679; *Moore v. Leflore County Bd. of Election Commissioners, supra*, 502 F.2d at 624.

15a. Although as discussed below in this opinion, motives were given undue weight at the expense of more fundamental concerns.

tricting government entity from the existent taint. If a neutral plan were permitted to have this effect, minorities presently denied access to political life for unconstitutional reasons could be walled off from relief against continuation of that denial. The redistricting body would only need to adopt a racially benign plan that permitted the record of the past to continue unabated. Such a rule would *sub silentio* overrule *White v. Regester.* It would emasculate the efforts of racial minorities to break out of patterns of political discrimination.

Recent Supreme Court cases have underscored the interplay, in equal protection cases, between racially discriminatory intent and racially differential impact as criteria for violation of the equal protection clause. In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), there was no claim of intentional or purposeful discrimination but only a claim that an employment test had a racially discriminatory impact. *Id.,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d at 604. The Court of Appeals for the District of Columbia held that lack of discriminatory intent was irrelevant and that disproportionate impact, standing alone and without regard to whether it indicated a discriminatory purpose, was sufficient to establish a constitutional violation. *Id.,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d at 606. This the Supreme Court rejected:

> But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact.

*Id.,* 426 U.S. at 239, 96 S.Ct. at 2047, 48 L.Ed.2d at 607. The court went on to point out that "disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Id.,* 426 U.S. at 242, 96 S.Ct. at 2049, 48 L.Ed.2d at 609. Invidiously discriminatory purpose may be "inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily upon one race than another." *Id.,* 426 U.S. at 242, 96 S.Ct. at 2049, 48 L.Ed.2d at 608–09.

In the next term, in *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1970), the Court followed the *Washington v. Davis* holding that disproportionate impact is neither the sole touchstone nor irrelevant. The Court pointed out that an equal protection plaintiff is not required to prove that challenged action rests solely on racially discriminatory purpose but that such purpose need be only a "motivating factor in the [legislative or administrative body's] decision." 429 U.S. at 266, 97 S.Ct. at 563, 50 L.Ed.2d at 465. The Court set down a non-exhaustive list of factors useful in the "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465. (1) The impact of the official action as bearing more heavily on one race than another, may be "an important starting point." (2) A clear pattern, unexplainable on grounds other than race, may emerge from the effect of state action even though the legislation is facially neutral. (3) "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." (4) Departures from normal procedural sequence. (5) Substantive factors, particularly if regularly considered important by the decisionmaker. (6) Legislative or administrative history. 429 U.S. at 267, 97 S.Ct. 555, 564, 50 L.Ed.2d at 465–66.

Assuming that these cases are to be applied to racial minorities' claims of exclusion from the democratic process, they would be of particular significance in the present case if the only issue were whether the racially neutral plan *created* such exclusion in Hinds County. But there is a second issue which we have pointed out, whether the plan, though neutral in design, was the instrumentality for carrying forward patterns of purposeful and intentional discrimination that already existed in violation of our Constitution.

When the indicia of *Arlington Heights* for determining intent are applied to the patterns of denial of access to blacks in Hinds County, the conclusion is not open to doubt. The chronology earlier in this opinion and in Appendix A is part of the legislative and administrative history of official resistance to black efforts to move into the full stream of the democratic process in Hinds County. And, as in *Gomillion v. Lightfoot*, it is a stark pattern, unexplainable on grounds other than race. Indeed, not even the defendants contend otherwise. They simply say that things have changed.

*Washington v. Davis* and *Arlington Heights* sharpen the emphasis upon purpose and intent, and focus upon the effect of official action as an evidentiary factor rather than a single determinator. But nothing in these cases suggests that, where purposeful and intentional discrimination already exists, it can be constitutionally perpetuated into the future by neutral official action.[16] Nor do they suggest that *White v. Regester* and its progeny are no longer law.[17]

The approach which the Supreme Court condemned in *Washington v. Davis* and *Arlington Heights* was not the one it had itself embraced in *White v. Regester* but the approach it had previously rejected in *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). In *Whitcomb v. Chavis* the plaintiffs failed to prove either that the plan being challenged was an intentional racial gerrymander or that there existed an intentional denial of minority access to the political process which the plan did not remedy. In terms of *Washington v. Davis* and *Arlington Heights*, the plaintiffs in *Whitcomb* grounded their case solely on the "effect" of the plan, i. e., that it did not give Marion County blacks proportional representation in the legislature, and were therefore unsuccessful in challenging its constitutionality. In contrast, the Dallas and Bexar County plaintiffs in *White v. Regester* were successful, even though they did not prove that the plan in question was a *Gomillion v. Lightfoot* type of racial gerrymander, because they established the requisite intent or purpose in the form of the existent denial of access to political process.

### III. Perpetuation of denial of access through the reapportionment plan

■ We turn to the inquiry whether the supervisors' reapportionment plan, adopted as a court-ordered plan, will in fact have the effect of perpetuating the denial of access to the political process that was proved by plaintiffs to exist. The district court concluded it would not, saying:

> The plaintiffs have failed to prove by the convincing evidence that their voting strength will be minimized or canceled out in any way by the Board plan, in which blacks constitute a majority of the population in two districts. In view of the possible variances in the computations of the voting age population in District Two and District Five, coupled with

---

16. If for no other reason, impact as an evidentiary factor, added to the present and past history, would preclude any such per se rule.

An analogy can be drawn between voting apportionment cases such as *White v. Regester* and school desegregation cases such as *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). In *Green*, the Court held that a school district which deliberately maintained a racially divided school system was under an affirmative duty to disestablish the dual school system, and that means such as freedom of choice plans, while not per se unconstitutional were unacceptable because they acted to strengthen rather than dismantle the dual system. In *White v. Regester* the Court in essence held that when a jurisdiction

which has purposefully or intentionally created a denial of minority access to the political process adopts a plan of apportionment, it is under a duty to make sure that any apportionment plan it proposes ameliorates the denial of access.

17. The Supreme Court's latest decision on the racial impact of reapportionment, *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, —— U.S. ——, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) lends strong support to the view that *White v. Regester* is alive and well. In *United Jewish Organizations* the opinions of Justices White and Stewart, representing the views of five members of the Court, both cite *White v. Regester* with approval. *Id.*

the heretofore noted inconsistencies in predicting block voting patterns in Hinds County, the Board plan offers black residents of this county, who constitute less than 40% of the total population, a realistic opportunity to elect officials of their choice, whether white or black, in two supervisors' districts and to significantly affect the election of county officials in the three remaining districts.

402 F.Supp. at 673. These conclusions of the court were not correct. The supervisors' plan fragments a geographically concentrated minority voting community in a context of bloc voting.[18] On its face, such a plan has a predictable tendency. Like a multimember plan, it tends to dilute the voting strength of the minority. In *Robinson v. Commissioners Court, supra*, a panel of this court noted that

> The most crucial and precise instrument of the . . . denial of the black minority's equal access to political participation, however, remains the gerrymander

of precinct lines so as to fragment what could otherwise be a cohesive minority voting community. . . . This dismemberment of the black voting community . . . had the predictable effect of debilitating the ·organization and decreasing the participation of black voters.[19]

505 F.2d at 679. The facially predictable effect of carving up a concentrated black voting area in Hinds County was confirmed by the trial testimony. Plaintiffs' expert witnesses, Drs. Loewen and Henderson, testified that black *voting age population* in Districts 2 and 5 was less than 50%.[20] In testimony not refuted by other witnesses, Drs. Loewen and Henderson concluded that it would be unlikely if not impossible for blacks to ever elect a candidate of their choice under the supervisors' plan.[21] Thus, plaintiffs established that the redistricting under the supervisors' plan would carry forward into the future an exclusion of the black minority from the democratic process

**18.** Plaintiffs presented uncontradicted evidence that a pattern of strongly polarized racial bloc voting exists in Hinds County. Although the district court found what it felt to be inconsistencies in the racial bloc voting thesis, it nonetheless termed the plaintiffs' evidence on racial bloc voting "persuasive." 402 F.Supp. at 672 n.4.

**19.** *Accord*: *Klahr v. Williams*, 339 F.Supp. 922, 927 (D.Ariz., 1972) (three-judge court). Commentators have also made note of the dilutive tendencies of plans which fragment minority voting communities. *See, e. g.*, Clinton, Further Explorations in the Political Thicket, 59 Iowa L.Rev. 1, 4 (1973).

**20.** Dr. Loewen, 48% in District 2 and 48.6% in District 5, with a margin of error of one to two percentage points; Dr. Henderson, 47% in both districts, which he described as "tolerably reliable."

Plaintiffs made an offer of proof by Dr. Loewen that the percentage of *black registered voters* in Districts 2 and 5 were, respectively, 41.7% and 41.2%. His calculations were based on a study by the Institute of Politics at Millsaps College, located in Jackson. Defendants objected because the study was not available to be introduced, and the court sustained the₄objection. In its opinion, however, the district court stated that even if it assumed the correctness of Dr. Loewen's calculations based on the Millsaps study, the sole reason for lack

of black voter registration was apathy. We have already pointed out that this conclusion is not supported by evidence.

**21.** However, we add the caveat that the election of black candidates does not automatically mean that black voting strength is not minimized or canceled out. We said in *Zimmer*:

"[W]e cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possibility of dilution of the black vote. Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election. Or such success might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds. In either situation, a candidate could be elected despite the relative political backwardness of black residents in the electoral district. Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution. This we choose not to do. Instead, we shall continue to require an independent consideration of the record." 485 F.2d at 1307. We continue to hold to the position taken by the court in that case.

of the county by minimizing or cancelling their voting strength.

The district court found that rather than minimizing or cancelling the voting power of the blacks, the supervisors' plan offered them a "realistic opportunity" to elect officials of their choice in Districts 2 and 5. This will not stand examination. First, the district court gave specific weight to the existence of black *population majorities* in these districts, 53.4% in District 2 and 54% in District 5. "We have consistently recognized that 'access to the political process and not population [is] the barometer of dilution of voting strength.'" *Bradas v. Rapides Parish Police Jury*, 508 F.2d 1109, 1112 (CA5, 1975). Where the cohesive black voting strength is fragmented among districts, the presence of districts with bare black *popluation majorities* not only does not necessarily preclude dilution but, as a panel of this court pointed out, bare population majorities may actually enhance the possibility of continued minority political impotence. *Moore v. Leflore County Board of Education*, 502 F.2d 621 at 624 (CA5, 1974).

Also, the court took plaintiffs' unrefuted voting age population figures and concluded that if the figures were adjusted upward by several percentage points, the percentages of blacks in Districts 2 and 5 would be approximately 50%. With equal logic, the figures might have been adjusted downward to approximately 45%. These figures, adjusted upward to a skin-of-the-teeth "maybe so" 50% of voting age population, were coupled with inconsistencies in predicting bloc voting patterns to support the inference of "realistic opportunity." This is too attenuated. Our concern is with basic rights of American citizens. The responsibility of the defendants to permit minority voters a proper role in democratic political life must be discharged by stronger stuff than gossamer possibilities of all variables falling into place and leaning in the same direction.[22]

Use of such thin evidence to conclude that blacks have a realistic opportunity to elect representatives of their choice is particularly inappropriate in the case of a court-ordered plan. In the case at bar public officials acting under an order of the court offered to the court a reapportionment scheme as a cure for existing one-man, one-vote deficiencies, asking that it be given judicial imprimatur. The Supreme Court's decisions in *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), and *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975), indicate that court-ordered apportionment plans are to be held to higher standards than legislatively enacted plans subject to the preclearance requirements of § 5 of the Voting Rights Act. 42 U.S.C. § 1973c. In *East Carroll* the Court held that the inclusion of multimember districts in a reapportionment plan was an "abuse of discretion," 424 U.S. at 639, 96 S.Ct. at 1086, 47 L.Ed.2d at 299, even though the Court has declined to hold that use of such a device was a *per se* constitutional violation. *White v. Regester*, 412 U.S. at 765, 93 S.Ct. 2332, 37 L.Ed.2d at 324; *Whitcomb v. Chavis*, 403 U.S. 124, 144, 91 S.Ct. 1858, 29 L.Ed.2d 363, 376 (1971). In *Chapman* the Court held that variances in population which would be tolerable in legislatively formulated plans were impermissible in the context of a court-ordered plan because "[a] court-ordered plan must, however, be held to higher standards than a

---

**22.** The panel opinion did not expressly reject the upward adjustment to "approximately 50%" but rather came up with its own conclusion of "about 47%," 528 F.2d at 539 n.11. Whatever the merits of the shifts in percentages around the 50% level, it must be kept in mind that the plan was court ordered and that (a) court-ordered plans are to be held to higher standards than legislatively enacted plans and (b) statistical deviations and variances which might pass muster in a legislative plan are unacceptable when found in a court-ordered plan. For example, in *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975), the Supreme Court held that variances in population which would be tolerable in legislatively formulated plans were impermissible in the context of a court-ordered plan because "[a] court-ordered plan, however, must be held to higher standards than a State's own plan[s]." 420 U.S. at 26, 95 S.Ct. at 765, 42 L.Ed.2d at 784.

State's own plans." 420 U.S. at 26, 95 S.Ct. at 765, 42 L.Ed.2d at 784.

Also, in approving the supervisors' plan the district court overemphasized factors that must be subordinated to the constitutional interests at stake. The court assigned great importance to the equalization of land area and road and bridge mileage. 402 F.Supp. 664–66. Supervisors have no responsibility for roads and bridges in the City, only in the rural areas. The 1969 plan had equalized road and bridge mileage and responsibility between the supervisors, and they were satisfied with this arrangement. *Id.* at 666. The draftsmen of the 1973 plan were so informed and sought to preserve this feature of the 1969 plan as far as possible. This aim was one of the reasons for leaving the 1969 district lines intact in the rural areas and redistricting by altering lines within the City, where the black population is concentrated. The court held that the purpose of the draftsman was to achieve equalization of population with approximate equalization of road and bridge mileage, 402 F.Supp. at 667,[23] and that to achieve this purpose it was necessary to divide the people of the City, black and white, among the five districts. *Id.* at 666. Thus, to preserve the 1969 plan's equalization of rural road and bridge mileage as desired by the supervisors, the 1973 plan split up concentrated black urban areas. There was simply too much emphasis on the administrative convenience of equal road and bridge responsibility at the expense of effective black minority participation in democracy.[24] Factors such as these may be considered in redistricting but they are not talismanic. "It is clear, however, that the mere fact that an apportionment plan may satisfy some legitimate governmental goals does not automatically immunize it from constitutional attack on the ground that it has offended more fundamental criteria." *Robinson v. Commissioners Court*, 505 F.2d 674 at 680 (CA5, 1974). Less fundamental

concerns must be subordinated to the constitutional interests of the citizenry. *Avery v. Midland County, supra*, 390 U.S. at 484, 88 S.Ct. 1114, 20 L.Ed.2d at 53; *Turner v. McKeithen*, 490 F.2d 191, 196 n.23 (CA5, 1973); cf. *Taylor v. Monroe County Board of Supervisors*, 394 F.2d 333 (CA5, 1968).

Finally, the district court expressed doubts that an ameliorative plan could be constitutionally formulated because such a plan would be a racial gerrymander in the manner of *Gomillion v. Lightfoot*, 402 F.Supp. at 677. Whatever merit the district court's view may have had, it is no longer viable after the Supreme Court's recent decision in *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, —— U.S. ——, ——, ——, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977).

Plaintiffs proved a long history of denial of access to the democratic process. That history of official action is one of purposeful and intentional discrimination. The structure and the residual effects of the past have not been removed and replaced by current access. The supervisors' reapportionment plan, though racially neutral, will perpetuate the denial of access. By fragmenting a geographically concentrated but substantial black minority in a community where bloc voting has been a way of political life the plan will cancel or minimize the voting strength of the black minority and will tend to submerge the interests of the black community. The plan denies rights protected under the Fourteenth and Fifteenth Amendments.

IV. Error on nonconstitutional grounds

As we have pointed out just above, a court-ordered reapportionment plan is held to higher standards than a legislative plan. A legislative plan need only meet constitutional standards. But, apart from constitutional grounds, a district court fashioning a reapportionment plan to supplant invalid apportionment may abuse its discretion in

---

**23.** In fact this finding was the basis for the finding that there was no discriminatory purpose in the preparation of the 1973 plan.

**24.** In this court, the panel opinion also gave weight to roads, bridges and land areas as "nonracial and rational criteria." 528 F.2d at 538 & n.8 & 543.

the shaping of remedial relief. *East Carroll Parish School Board v. Marshall, supra; Chapman v. Meier, supra.* In this instance, for the same reasons which we have spelled out in discussing the constitutional violations, the district court's approval of the supervisors' plan was just such an abuse of its equitable remedial discretion. In *East Carroll* the Supreme Court discussed this duty placed upon the court itself in the context of the preference in reapportionment cases for single member rather than multimember election districts, and held that a court fashioning a plan including multimember districts was guilty of abuse of discretion even though the use of such districts was not held to be a constitutional violation. 424 U.S. at 639, 96 S.Ct. at 1085, 47 L.Ed.2d at 299. Multimember districts are objectionable because they tend to minimize or cancel the voting power of minorities. Slicing up a cohesive minority voting area in a community where there is bloc voting has the same tendency to exacerbate rather than remedy denial of access to the political process. Thus, as a matter of its remedy-fashioning power, the court could not approve a plan which tended to carry forward into the future the long-lived denial of black access to the political process. Also, in the process of concluding that it would give approval the court unduly emphasized the administrative factors of roads and bridges, and it gave weight to black population majorities as a barometer of access to the political process. Additionally, the court mistakenly thought that its remedial power was constricted by the racial gerrymander concept of *Gomillion v. Lightfoot.*

Achieving one-man, one-vote political democracy without excluding minorities from political life is a complex task that challenges the best of intellects and requires examining many facets of the community, past, present and future. The problem is not susceptible of simplistic solutions, however seductive they may appear. No mechanistic solution is an alchemistic philosopher's stone that will turn all the problems of past and present to future gold.

REVERSED and REMANDED to the district court for the fashioning of a remedy.

## APPENDIX A

(From 402 F.Supp. at 670–71.)

(26) This Court has carefully considered the evidence presented by the plaintiffs in their attempt to establish the proposition that the process leading to nomination and election are not equally open to blacks in Hinds County, including, inter alia, the fact that no black has ever been elected to the Hinds County Board of Supervisors or any other office in Hinds County (Exhibit P–24, page 32; testimony of Henry Kirksey); the retention of the poll tax as a requisite to voting in this State until 1966; the retention until 1966 by this State of a literacy test as a requisite to registration, Mississippi Constitution § 244, as amended in 1954, implemented in Mississippi Code Ann. § 3213 (1956 Recomp.); the conditioning of primary participation on adherence to party principles, and successive adoption of alleged segregation principles by party organizations; the requirement that a member of the Board of Supervisors be a resident freeholder of the district which he represents and the owner of real estate therein valued at $1500, coupled with the fact that a much larger percentage of blacks in Hinds County fall below the census poverty lines as opposed to whites, Mississippi Code Ann. § 19–3–3 (1972); Exh. P–3, page H–1); the designation in 1965 of Hinds County for the use of federal examiners pursuant to § 6 of the Voting Rights Act of 1965, 42 U.S.C. § 1973d, and the subsequent registration pursuant thereto; the disqualification of certain black candidates by the Hinds County Election Commission and exclusion of their names from the general election because they had voted in the August 1967 Democratic primary in violation of the 1966 Amendment to Mississippi Code Ann. § 3260 (1956 Recomp. Pocket Part), which was thereafter held unenforceable because of the failure of its submission pursuant to Section 5 of the Voting Rights Act and was subsequently objected to by the Attorney

General;[3] the testimony of Dr. Loewen, based on 1970 census data, concerning the disproportionate educational, employment and income level and living conditions between whites and blacks in Hinds County, and the effect on blacks' ability to register and vote and to run as candidates for office; the allegedly high rate of block voting by whites and blacks in Hinds County; and several electoral mechanisms presently operative in elections in Hinds County, including the requirement of a majority vote as a prerequisite to party nomination and winning a special election, Mississippi Code Ann. §§ 23–3–69; 23–5–203; 23–5–197 (1972); the prohibition against single shot voting, Mississippi Code Ann. § 3110 (1956 Recomp.); and the requirement of at-large elections of county election commissioners, Mississippi Code Ann. § 23–5–3 (1972), all of which the plaintiffs contend exclude blacks from equal opportunity to participate and win elections in Hinds County.

(27) Furthermore, this Court has carefully considered the evidence presented by the plaintiffs in their attempt to establish a lack of responsiveness on the part of white elected officials in Hinds County, including, inter alia, the findings by this Court and others of systematic exclusion of blacks from jury lists in the First and Second Judicial Districts of Hinds County, *Love v. McGee*, 297 F.Supp. 1314 (S.D.Miss.1968); *Goode v. Cook*, 319 F.Supp. 246 (S.D.Miss. 1969), and *Spencer v. State*, 240 So.2d 260 (Miss.1970); the support and maintenance of the Board of Supervisors by tax levy of two allegedly racially segregated agricultural high schools and juniors colleges within Hinds County, Hinds Junior College and Utica Junior College, and an alleged disproportionate funding of these colleges (Minute Book 55, page 277, Exh. P–45); the appointment of only white persons as members of the County Board of Public Welfare in Hinds County (Minute Book 56, page 608; Minute Book 74, page 214; Kirksey Testimony); the failure of the Board of Supervisors to provide funds for the Community Hospital for Negroes of Jackson (Minute Book 56, page 681)· the authorization of an ad valorem tax exemption for Jackson Academy, Inc., an allegedly racially segregated private school maintained for the purpose of providing an alternative to the public school desegregation (Minute Book 60, pages 25–26 and passim); and the maintenance and levying of taxes in support of a dual school system in Hinds County prior to 1965 by the Board of Supervisors, in conjunction with the Hinds County Board of Education and the Board of Trustees of the Jackson Municipal Separate School District, the Board of Education members being elected from each of the supervisors' districts and the Board of Trustees being appointed by the Jackson City Council [*Singleton v. Jackson Municipal Separate School District*, 348 F.2d 729 (5th Cir. 1965); 355 F.2d 865 (5th Cir. 1966); 419 F.2d 1211 (5th Cir. 1969), rev'd, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970); 425 F.2d 1211 (5th Cir. 1970); 426 F.2d 1364 (5th Cir. 1970); 430 F.2d 368 (5th Cir. 1970); 432 F.2d 927 (5th Cir. 1970), and *United States v. Hinds County School Board*, 402 F.2d 926 (5th Cir. 1968); 417 F.2d 852 (5th Cir. 1969), cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 531 (1969); 423 F.2d 1264 (5th Cir. 1969)].

[Footnote omitted.]

GEE, Circuit Judge, specially concurring:

Both at the time of the district court's action and decision in this case and at the time of our panel opinion, 528 F.2d 536 (5th Cir. 1976), the clear constitutional law of equal protection seemed to be that racial gerrymanders, *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and election districts drawn along racial lines, *Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), were invalid. Faithful to that apparent mandate, the trial court ordered the preparation of a plan drawn without regard to race, found on essentially undisputed evidence that it was so drawn, and ordered it installed and implemented. It also seemed to be the law that even such a plan might be invalid unless it had effect to give each significant racial group in the electorate of the apportioned community a fair opportunity to

elect representatives of its choice.[1] This was not thought to mean, however, that voting districts must be so arranged that proportional representation, either by race or by racially chosen representatives, was afforded.[2]

In the light of these imperfectly harmonious imperatives, the panel examined the district court's actions and decision from two perspectives. First, we reviewed the evidence supporting the finding that the court's plan was drawn without regard to race. This was, as noted, essentially undisputed. The court's decision that the plan was so drawn therefore seemed beyond our power to disturb. Next, we attempted to discern a model against which to measure the plan's likely effect, concluding as follows:

It remains to determine whether the supervisors' plan approved by the court below, though not by design, *otherwise* —that is, unintentionally—operates to minimize minority voting power in an impermissible way. To determine whether that power is minimized, we must first ascertain its proper or natural magnitude, its expectable effect under normal conditions when neither weakened nor enhanced. And this is simply stated: in an infinite series of elections, any 35% of the electorate should elect 35% of the candidates whom it favors or, in other words, it should receive proportionate representation. As applied to any hypothetical five-man board, then, our 35% voting bloc should be represented by two out of five officials favored by it about three-fourths of the time and by only one of the other fourth. This model illustrates its normal voting strength.

1. The panel opinion quotes, 528 F.2d at 540–41, the commination against plans which "designedly or *otherwise*" minimize black voting strength found in *Burns v. Richardson*, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), itself drawn from *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965).

2. At 528 F.2d 541, the panel opinion quotes Judge Rives, writing for the court in *Gilbert v. Sterrett*, 5 Cir., 509 F.2d 1389, 1391:

Plaintiffs are correct when they insist that we consider whether the impact of the black vote in Hinds County is diminished by the proposed plan. Where they err is in their selected model against which diminishment is to be measured. Plaintiffs focus on preserving intact the black geographical cluster in northern and central Jackson and would have us determine diminishment by inquiring merely whether the proposed district lines divide it. But of course they do. Any likely division of the county would do so except one drawn on racial lines with the purpose of securing safe "black" or "white" seats on the board of supervisors. Plaintiffs' focus is too narrow, their approach too mechanical, at this stage of the inquiry. There being no intended gerrymander, the proper present focus of inquiry is not a map area[19] but the voting power of the entire black populace of Hinds County, and the model against which its claimed diminishment must be measured is, as indicated above, the number of seats on the board proportionate to that population's percentage of the whole.

[19] Of course, the unusual shapes of the proposed districts are important. But the shapes are chiefly relevant to the question of whether the plan is a racial gerrymander. Once we accept the district court's unchallenged findings that the plan was drawn without reference to race and that the districts reasonably follow natural boundaries, *see* p. 538 *supra*, the significance of the geographic shapes is almost exhausted. They may, for example, indicate nothing more than a *political* gerrymander, an inhabitant of the thicket at present out of season to courts. *See Jiminez v. Hidalgo County Water Imp. Dist. No. 2*, 68 F.R.D. 668, 672–75 (S.D.Tex.1975).

So tested, the conclusion of the district court stands firm that

An apportionment scheme is not constitutionally impermissible merely because its lines are not carefully drawn to ensure representation to sizable racial, ethnic, economic or religious groups.

*See also Whitcomb v. Chavis*, 403 U.S. 124, 156–60, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), and *Turner v. McKeithen*, 490 F.2d 191, 197 (5 Cir. 1973).

the black voting strength in Hinds County is not minimized or cancelled out by the 1973 Board plan, but on the contrary, the Board plan offers black residents of Hinds County, who constitute less than 40% of the total population thereof, a realistic opportunity to elect officials of their choice, whether they be white or black, in two supervisor's districts and significantly affect the election of county officials in the three remaining supervisors' districts

. . . .

528 F.2d at 542–43. Measuring the plan against this model, we concluded that the district court did not err in finding that the plan offered a realistic opportunity to each segment of the community, consonant with its normal or natural voting strength, to elect representatives favored by it. We therefore affirmed the trial court.

At the time of en banc hearing in September 1976, the array of Supreme Court decisions in the general area of equal protection was, but for the addition of *Washington v. Davis*,[3] unaltered. Nevertheless, the en banc court was able tentatively to discern that we and the trial court had erred in our crucial assumption: that racial gerrymandering to augment or diminish the voting strength of voting blocs within the community was unconstitutional. On March 1, 1977, with the delivery of the Supreme Court's opinion in *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, —— U.S. ——, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), it became clear that the en banc court was correct in its perception of things to come and that our panel had been mistaken. Thus, the opinion of the en

banc court, indirectly but unmistakably commanding the trial court to devise and install a more partisan gerrymander in favor of Hinds County black voters so as to guarantee their proportionate representation on the county board, seems to be both required and appropriate.

Until only yesterday, it had seemed possible to discern a firm and accelerating trend in Supreme Court authority to require proof that discriminatory intent was a motivating factor in a state or local action before invalidating it.[4] As each of the decisions cited in footnote 4 was handed down, I for one became increasingly convinced that the unassailable (and, in my view, unassailed) finding of the trial court herein that no regard was given to race in preparing the now-invalidated plan rendered the plan invulnerable to attack on equal protection grounds. This budding conviction was cut down by the *United Jewish Organizations* decision, which I can only read as approving, not racial gerrymanders only, but those of such generous dimensions as to dictate the outcomes of elections and insure proportionate representation. It is true that the holding's import is slightly blurred since what was there approved was "voluntary" legislative action under pressure of the Attorney General, acting pursuant to the Voting Rights Act; but, like the Chief Justice, I do not see how these considerations can sanitize what would otherwise be unconstitutional.[5]

I take respectful leave to say briefly why I think this a wrong turning. It is hard to avoid the conclusion that by *United Jewish Organizations* what the Court underwrites is a tribal, rather than a republican, form of

**3.** 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *See* n. 4, *infra.*

**4.** *Washington v. Davis, supra* (absent discriminatory intent, qualification examination for police recruits not invalid solely because it disqualified black applicants disproportionately); *Austin Independent School Dist. v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976) (school desegregation order remanded for reconsideration in light of *Washington v. Davis*; segregative intent posed as issue in special concurrences); *Village of Arlington*

*Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (denial of zoning for low-income housing project not unconstitutional for racially disproportionate effect; proof of discriminatory intent or purpose as motivating factor requisite).

**5.** *United Jewish Organizations, supra,* —— U.S. at ——, 97 S.Ct. at 1018–1021, 51 L.Ed.2d at 256–59, *passim* (Burger, C. J., dissenting).

government.[6] Transposed to this case where the federal court must devise a plan, the clear implication of *United Jewish Organizations* is that a life-tenured magistrate is to exercise a casting vote in the selection of local legislators.[7] For who does not know that by judicious tinkering with apportioning lines almost any electoral outcome desired can be produced? Indeed, this is precisely what we now appear to require the district court to do.[8] I had not thought that the constitution empowered any court to intrude so far upon the elective process. But unless this is what the *United Jewish Organizations* decision requires and means, then I do not know what it means.

And if this is its meaning, we have indeed come a long way from *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), with its demand that every citizen's vote be equal in weight as nearly as may be,[9] and from *Gomillion v. Lightfoot, supra.* These decisions had effect to free the electoral process from vote-weighting contrivances; *United Jewish Organizations* approves their deliberate imposition, and on avowedly racial grounds at that. It is true that the racial gerrymander there approved was done by the New York Legislature under pressure from the Congress,[10] but I am unable to grasp how this can validate action so plainly at variance with the language of the fourteenth and fifteenth amendments and uncomfortable with court action intruding so purposively and affirmatively upon the process of selecting legislative bodies. Removing trammels upon the equality of the franchise is one thing; deliberately gerrymandering to weight some votes and lighten others in order to produce a representative of a particular race, or at least a representative especially beholden to one racial bloc of the electorate, seems to me quite another. What seems to be envisioned is something more approximating a tribal council than a representative body chosen by republican methods.

To say no more, then, with the delivery of *United Jewish Organizations,* my apprehension of equal protection law is cast in disarray. Doubtless the Court holds a coherent vision of better things to come which is denied me.[11] At any rate, I am sustained

6. *See* United States Constitution art. IV, § 4.

7. The only logical alternative is to me inconceivable: that what is a constitutional gerrymander when done by a legislature is not so when done by a court in the legislature's default. Since the court is to act in the legislature's place, surely it is to do what the legislature should have done?

8. I say "appear" because I am as confused as Judge Clark, *infra* at 158–159, slip opin. at 3803, about what election outcome it is that the en banc majority directs the district court to produce. What is generally desired—a plan confected on racial grounds and weighted more heavily toward the black voter—is tolerably clear. But if an outcome is to be configured, and if the majority is correct in its factfinding of pervasive bloc voting, several choices are possible. The district court could, for example, deploy the 35% minority of black voters so as to produce three districts out of the five with almost two-to-one black majorities and so insure, again assuming the rigorous voting by race which the majority ascertains, a black majority on the county board. I doubt this is what the majority envisions; probably what it wants is guaranteed proportionate representation by race. But I do not know; and if this is what the majority wants the district court to produce, then I think the majority should steel itself to say so.

9. "Every qualified resident . . . has the right to a ballot for election of state legislators of equal weight to the vote of every other resident. . . ." 390 U.S. at 478, 88 S.Ct. at 1117.

10. It seems ironic that there, in order to achieve a sufficiently partisan gerrymander in favor of "non-whites," the Attorney General required (the Supreme Court eventually approving) that the New York Legislature fragment one of the few geographically concentrated communities of Hasidic Jews in the United States; while the majority in this case invalidates the district court's plan primarily because it "fragments a geographically concentrated minority voting community."

11. It may even be that *United Jewish Organizations* signals the first note of recall from the thicket. That opinion can be read as indicating that from henceforth the courts are to withdraw with the best grace they can muster and leave contests on this particular darkling plain to be fought out among Congress, the Attorney General and local governments. But in this event, what are such district courts as ours here to do when they themselves are required to fashion plans?

by the recollection that it is not for us to pursue matters of national policy in competition with or obstruction of the Court. Where relevant precedent exists, our duty is to ascertain and obey that which is closest and most recent. For the time being, that is *United Jewish Organizations.* Since it is, I concur in the en banc court's judgment invalidating those of our panel and the district court, though not in its opinion.

COLEMAN, Circuit Judge, dissenting:

I join in the dissenting opinion filed by Judge Clark. I agree with all that he has written, but I am particularly disappointed that the en banc Court reassigns the District Court to the drawing board without specifying the standards which would meet the requirements of the law. This will likely breed further appeals and further delays.

Secondly, I must point out that the Order granting rehearing en banc in this appeal was entered May 12, 1976, exactly one year ago as this is being written. The en banc opinion, in its present form, was circulated on March 31, 1977. In the meantime, on February 28, 1977, the Supreme Court heard oral argument in *Connor v. Finch,* the statewide Mississippi legislative reapportionment case. The *Kirksey* case is so interrelated with *Connor* that the *Kirksey* record was appended as an exhibit to that appeal and is the subject of discussion in the Supreme Court briefs. As one of the Judges who sat on *Connor*, it is my considered opinion that when the Supreme Court acts on *Connor* there will be nothing left to *Kirksey* but a brief *per curiam,* one way or the other.

It is well known, of course, that we have an entrenched practice of deferring action on an appeal involving issues pending before the Supreme Court. We await, as we should, guidance which we think is likely to be forthcoming from the High Court. The next scheduled election for Supervisors in Mississippi does not take place for over two years—August, 1979. After *Connor* was argued, with no opinion yet ready to come down from the en banc Court in *Kirksey,* I

requested in writing that we defer our opinion until the Supreme Court decided *Connor.* Contrary to the precedent which has been followed in this Court during the twelve years I have been a member of it, the request was denied by a majority of the en banc Court.

Since Hinds County has thus, in my opinion, been denied the treatment usually accorded other litigants, I respectfully record the occurrence and make no further comment.

CLARK, Circuit Judge, with whom COLEMAN and HILL, Circuit Judges, join, dissenting:

From another part of the political thicket I answer Judge Gee's lamentation that his panel opinion views have been lost in new Supreme Court law with the equally plaintive response that I am lost in the analysis, the supporting facts, and the remand for remedy disposition which today's en banc majority imposes.

Two distinct approaches have been utilized in assessing the validity of apportionment plans. Where the plan under attack was adopted by a state or local legislative body, a constitutional analysis has been used. *See e. g., White v. Register,* 412 U.S. 755, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973). But where the challenged plan was put into effect by federal judicial decree, a "propriety of the remedy" analysis has been utilized. *See e. g., East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Since this case involves a court-ordered plan, only the latter approach is applicable. The en banc majority's partial reliance on the constitutional analysis is, I respectfully submit, misplaced, because this plan was not implemented by state action. It is a distracting confusion because evidence that the Board of Supervisors intended to discriminate on the basis of race, which would be necessary to demonstrate the existence of a constitutional violation, is irrelevant to the determination of whether the remedy formulated by the district court was a permissible one.

**158**

Under the proper remedy analysis, our task is to decide what constitutes an abuse of discretion in formulating a remedial apportionment plan, and to examine the record in light of the standards developed. To date the Supreme Court has indicated that a district court abuses its discretion when it creates a plan (1) in which there exists excessive interdistrict population disparity, or (2) that contains multimember districts "absent unusual circumstances." *See Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *East Carroll Parish School Board v. Marshall, supra.* To these two forbidden practices the majority proposes to add a third: the creation of a plan that "slic[es] up a cohesive minority voting area in a community where there is bloc voting." The majority suggests that this addition is justified because such a plan is like one containing multimember districts in that it tends to submerge the political voice of racial or political minorities. But in *Chapman v. Meier, supra,* the Supreme Court supported its holding that the inclusion of multimember districts in a court-ordered plan was an abuse of discretion with four reasons. The tendency of multimember districts to submerge minorities was merely one. None of the other three reasons relied upon in *Chapman* is applicable here. In addition, this court furnishes the district court no guidance in determining whether the new remedy it must fashion will meet this third standard.

Although it does not flesh out the premises which support its third factor, the majority clearly indicates it would necessarily rest on two factual findings: First, that there is bloc voting within the affected community; and second, that blacks are a minority of the voting age population in the districts created. For the reasons discussed below, I respectfully submit that an insufficient basis exists in the present record for drawing either conclusion. Thus, even if the majority's third factor is a proper one, it should not be used in remedy formulation until the foundation facts are established.

The key fact premise of Judge Godbold's opinion is that in Hinds County whites always vote for whites and blacks always vote for blacks. It is taken as a given, yet its only basis is a survey. While the district court did characterize the survey as "persuasive evidence," it found the survey to be internally "incomplete" and "inconsistent" and "completely inconsistent" with other proof in the record. Although no contrary opinion or survey evidence was offered, I believe the unequivocal determination of incredibility given this survey by the trier of facts at least requires a remand to determine which way truth lies as to this crucial issue.

The district lines which the district court drew are ordered obliterated because two districts show 48% rather than clear majority black voting age populations. These statistics are based on 1970 census data. Yet that same seven-year-old data base discloses that in the age groupings which would include those now eligible to vote, the percentage of blacks grows increasingly greater in each younger age cohort group.[1] I don't know whether the presently formed districts are now clearly majority black or not. I only assert that the rest of the court doesn't know either. If they are today in fact "safely" majority black in voting age population, the majority would not say that they are wrongly drawn under the criteria

1. The 1970 Census of Population (advance report), General Population Characteristics, U. S. Dept. of Commerce, Publication PC (VA)–26 (Miss.), shows the following data for Hinds County, which had a general population in 1970 that was just over 60% white:

Children aged 15 – 24 in 1970:

| | | |
|---|---|---|
| Total: | 41,019 | |
| White: | 23,542 | 57.4% |
| Black: | 17,477 | 42.6% |

Children aged 5 – 14 in 1970:

| | | |
|---|---|---|
| Total: | 46,980 | |
| White: | 24,661 | 52.5% |
| Black: | 22,319 | 47.5% |

I readily acknowledge that the groupings are over-inclusive at the young- and old-age ends. The data is not available in more refined form in the referenced publication. It does suffice to make the statistical point that the percentage

it advances. An injunction always looks to the future. Conditions existing in 1970 are pertinent only as guides to the present, and those conditions indicate we should require present proof.

Equally distracting is the majority opinion's creation and ex post facto application of a new presumption in its constitutional analysis. The proof showed that Hinds County has a history of racial discrimination. Today it is announced for the first time in a redistricting case that the defendants must bear the burden of showing this past forms no part of the present. That is a burden they might have carried had they but known they were obliged to do so.[2] Despite its insertion at the appellate level, and contrary to the requirements imposed at trial, we do not permit this defendant to try to meet our newly imposed standard. This court has never cut across due process in this fashion before. I regret we do it today.

I am perplexed by the majority's determination that the district court abused its discretion in formulating a remedy which that court found to be wholly free of racial motivation. The trial court has been held to have abused its discretion by "slicing up a cohesive minority vote area in a community where there is bloc voting," and approving a "plan which tended to carry forward into the future the long-lived denial of black access to the political process." Aside from my disagreement with the appellate factfinding that underlies these condemnations, I don't understand them to give proper guidance to the district court in its task of revising the geographic lines between supervisor districts in Hinds County. Is the "higher standard" that the court plan must meet more than the requirement that blacks be afforded a realistic opportunity to elect representatives of their choice? Is the

district court told that the *United Jewish Organizations* case mandates racial gerrymandering? If it is, what is the district court's duty and what are the ambits of its discretion? Must that court assume bloc voting and create "safe" black seats on the Board of Supervisors? How many must it create, as many as possible or just enough to approximate the county-wide black population?

I respectfully submit that the en banc court has been too free with criticism and too parsimonious with guidance, and I therefore dissent from the remand of the case limited to remedy formulation before we know what the facts are and before we say what standards must be applied.

HILL, Circuit Judge, with whom CLARK, Circuit Judge, joins, dissenting:

I join in the dissent of Judge Clark, and I am constrained to add a few lamentations of my own.

In our federal judicial system, district court judges are unable to avoid deciding any particular case submitted to them. The litigants and their counsel, for the most part, determine the issues which are presented to the court and the trial judge must ultimately render a judgment delineating the proper and legal result. This final judgment establishes the rights and liabilities of the parties and must be articulated with sufficient definiteness so that a marshall may execute it. I submit that when a case is appealed to this court, we are under the same duty to decide the issues presented with sufficient clarity that a conscientious district judge may execute our decision. The opinion for the majority avoids doing so.

The procedure tacitly adopted by the majority might be appropriately described as

of blacks in Hinds County's 1970 population increased significantly in the lower-age brackets.

2. Without attempting to fix blame or praise on local, state or federal politics, it is an easily established fact that black registration and participation in electoral procedures is up dramati-

cally in Hinds County, and economic and social advances by blacks which were totally unenvisioned by either race ten years ago, have also occurred. I say this to make plain that the burden may not be as impossible to meet as the recitation of past history may indicate.

"dodge the bullet." The opinion for the majority is content with general observations on the development of the law in the area and expresses general discontent with the course of events in the district court. Then, the truly tough and nettlesome issues are swept from our bench and returned to the trial court in an apparent apocalyptic "reversed and remanded to the district court for the fashioning of a remedy."

I regret that this course has been chosen. In an expression of chauvinism perhaps not totally inappropriate due to my recent appointment to this court, it has been my observation over the years that of all the judicial bodies in this land the United States Court of Appeals for the Fifth Circuit has traditionally taken the lead in making hard decisions in this and related areas of the law. We shun our history in the decision of this case and merely say to our district court judges, "Guess again; we will tell you after the fact whether you are right."

I see it as our duty to inform rather than confound; to explain rather than merely complain; to enlighten rather than obfuscate. When the district judge and counsel for the litigants in this case have studied the opinion for the majority, they should know what is to be done in the case. Litigants and trial judges appeal for direction from this court, but I apprehend that they look in vain upon the majority opinion. The only direction given by the disposition of this case is that the direction taken was wrong so try another way. I apprehend that responsible public officials throughout this circuit desire to conduct the affairs of their offices according to the law. While the majority opinion accurately proclaims the difficulties confronting public officials, lawyers, and district judges, the case is remanded over two years after we were asked for direction without the much needed guidance. We do the litigants, trial judges, public officials and ourselves a disservice.

What I write here discloses some different views from those expressed by Judge Godbold for the majority. Yet, my dissent is not so much from what he says as from the majority's failure even to apply the principles it expounds to the issues in this case for the guidance of the litigants and the trial court. One reads *United Jewish Organizations of Williamsburgh, Inc. v. Carey,* —— U.S. ——, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) and instinctively feels that the Attorney General also drew back from articulating his decision.[1] Thus, the parties were relegated to operating on the basis of a "leak" from an undisclosed member of his staff[2] to which they promptly responded.[3] This scenario suggests that if only the parties could find out what the Fifth Circuit *really* wants *sub silentio,* then they would readily comply. This is no way for the Office of the Attorney General to transmit decisions and I am confident that this court would not tolerate such a procedure.

I frankly have no more appetite than my brothers for "biting these bullets." If it were not legally mandated that "[c]ases and controversies shall be heard and determined" by our court, 28 U.S.C.A. § 46, I might remain silent and concur. Since it our duty to decide, I shall refer to only a few of the questions that I feel have been raised but which the majority declines to answer.

What is the legal significance of the fact that no black person has ever been elected to the Board of Supervisors of Hinds County, Mississippi? The Court repairs to *Zim-*

1. Thus, in his letter to the New York State authorities the Attorney General would only say, "[w]e know of no necessity for such configuration and believe other rational alternatives exist." *United Jewish Organizations v. Carey, supra* at —— n. 6, 97 S.Ct. at 1002.

2. An unnamed Justice Department official made known that satisfaction of the Voting Rights Act would necessitate the creation of 10 districts with threshold nonwhite populations of 65 percent. *See United Jewish Organizations v. Carey, supra* at ——, 97 S.Ct. 996 (Brennan, J., concurring in part).

3. The revised plan submitted by the state contained ten districts with nonwhite populations of between 65 and 90 percent.

*mer v. McKeithen,* 485 F.2d 1297, 1305 (5th Cir. 1973), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), to restate that "[c]learly, it is not enough to prove a mere disparity between the number of minority residents and the number of minority representatives." (footnote omitted). Later, the majority observes that "the absence of black elected officials in a county where approximately 35% of the voting population is black is an indication that access of blacks to the political processes of the county is not yet unimpeded." *Ante* at 146. While these two assertions may not be contradictory in their finer points, the question raised and left unanswered by the court is the significance of this fact. The majority uses this fact to support the proposition that the residual effects of past practices on the access of blacks to the political process have not been dissipated in Hinds County. Even if true, however, the probative value of this fact on the constitutionality of the present apportionment plan—under which no elections have been held—is tenuous.

More fundamental, this conclusion by the majority raises the question of what is meant by "access to the political process." Ironically, the task of establishing the substantive content of this concept falls upon federal judges who are appointed rather than elected and who have from the time of their appointment properly removed themselves from the art and science of politics. Is genuine access to the political process better provided to a minority by placing its members in one or two political "ghettos" so that supervisors from other districts have, remaining, no significant number of minority voters to whom they must pay heed in the discharge of their duties? Is it better access to be assured of the power to elect a minority or to be in a position to have a significant impact upon the outcome of elections for the majority? Is it our national purpose under the law to achieve a

truly homogenous society in which free and independent voters cast their ballots for candidates that they deem best qualified, regardless of race, or do we despair of that goal and retreat to establishing black elections for black officials and white elections for white officials as the only possible response to the odorous "white primaries" of the temporally recent but factually remote past. The district court in this case is entitled to know which course this court directs.[4]

I suggest that the conscious creation of "safe" black districts may not be a talismanic solution for insuring access to the political process. Simplistic solutions tend to be stop-gap remedies. Surely, no one believes that all that this court must do is insure that a few blacks are elected in Hinds County and nirvana shall be reached. To place the black citizens in that perpetual minority position could be permanent denial of the sort of political access that results in governmental responsiveness.

Conscious "benign" racial gerrymandering also raises possible problems. A purported preference may disguise a policy that actually perpetuates disadvantageous treatment. "An effort to achieve proportional representation, for example, might be aimed at aiding a group's participation in the political processes by guaranteeing safe political offices, or, on the other hand, might be a 'contrivance to segregate' the group, thereby frustrating its potentially successful efforts at coalition building across racial lines." *United Jewish Organizations v. Carey, supra,* —— U.S. at ——, 97 S.Ct. at 1013 (Brennan, J., concurring in part) (citation omitted). In addition, "benign" racial preferences may stimulate latent race consciousness and stigmatize recipient groups. *Id.* Finally, "benign" racial preferences assume that all individual minority persons have identical interests— an assumption often divorced from reality. *See Wright v. Rockefeller, supra,* 376 U.S.

---

4. For my part I shudder to think that the majority endorses the words of John W. Davis for South Carolina in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873

(1954). "The good is sometimes better than the best." *See Wright v. Rockefeller,* 376 U.S. 52, 62, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964) (Douglas, J., dissenting).

at 53–54, 62, 84 S.Ct. 603 (Douglas, J., dissenting).

As mentioned above, it seems inappropriate that those of us in the one branch of government purposefully and properly removed from politics should presume to weigh and decide these questions of political access and official responsiveness on a record totally devoid of any expert evidence from either practical politicians, political science students, or both. Were the case to be remanded as Judge Clark suggests (and in which suggestion I join) for the taking of evidence as to the continued effect of past denials, the district court should also be directed to develop a record of qualified evidence on these issues.

Finally, does the majority say that, in a case such as the one before us, the district judge is required under the law consciously to consider race in establishing voting districts? *United Jewish Organizations v. Carey, supra,* clearly holds that in cases arising under the Voting Rights Act, 42 U.S.C.A. § 1973 *et seq.,* a state legislature *may* constitutionally do so. Must a district court in a non-Voting Rights Act case draw district lines with a conscious regard for race? Perhaps the Constitution requires it (though I doubt it), but I submit that our court is obligated to "belly up to the bar" and furnish our district court brother our answers to these hard questions rather than content ourselves with expressions of discontent with his solution.

I must confess that I am somewhat perplexed by the concurring opinion of Judge Gee. He apparently reads *United Jewish Organizations v. Carey, supra,* as "commanding the trial court to devise and install a more partisan gerrymander in favor of Hinds County black voters so as to guarantee their proportionate representation on the county board." *Ante* at 155. With all due respect I find this conclusion bewildering. My reading of the Supreme Court's opinion is much less daring. *United Jewish Organizations* merely holds that a state political body attempting to comply with the Congressional mandate embodied in the Voting Rights Act is not *prohibited* by the Constitution from considering race in establishing election lines. This is a far cry from ruling—as our court may be doing today— that the Constitution *requires* that race be consciously considered.

Related to this subject, one notes that Judge Godbold refers to the rule "that court-ordered apportionment plans are to be held to higher standards than legislatively enacted plans subject to the preclearance requirements of § 5 of the Voting Rights Act." *Ante* at 150. I take no issue with this rule, but I am puzzled by his application of it in this case. Apparently, this rule is suggested as bolstering the court's rejection of the court-ordered plan in this case. Of course, the *United Jewish Organizations* decision was concerned with a legislatively enacted plan. For me it more logically follows that, because we are dealing with a court-ordered plan in this case, and since court-ordered plans are held to higher standards, the Constitution may very well prohibit conscious racial gerrymandering by a court while permitting it by an elected state political body implementing the Voting Rights Act. In sum, what the "lower standard" allows a state legislature to do, the "higher standard" prohibits a federal court from doing. I respectfully suggest that the majority has simply placed the rule on its head.

Were these and other issues addressed by our court today, I might find myself in no posture to dissent. As it is, I am in no posture glibly to concur. I also join with Judge Clark in the strong opinion that the county litigants should be afforded an opportunity to develop evidence for the district court as to whether past practices presently affect access to the political process now that the rules have been laid down. The passage of time alone does not create remoteness; events can make remote that which is temporally recent. Nothing is older than yesterday's newspaper and there is hardly anything newer than our Constitution and its Bill of Rights. The majority chides the district court for decisions based on conjecture. Then, this court establishes an evidentiary rule and defaults the defend-

ants for failing to have predicted and followed it. I submit that the question of whether past practices affect present access is not one that should be based upon "conjecture" at the trial or on appeal.

As Judge Coleman in dissent points out, we feel compelled to hand down our decision without further delay. I take no special issue with that except to note that in the time available I have been able to suggest only some of the issues upon which we offer no decision. Others will appear. The last paragraph of the majority opinion accurately articulates the difficulties to be encountered in their resolution. Yet, we should decide the hard ones along with the relatively easy ones. I apprehend that the district judge would appreciate our directions even more than the compliment implied in our remand to him of these questions.

Therefore, I dissent.

John R. Martzell, New Orleans, La., for Richard A. Tonry.

William J. Guste, Jr., Atty. Gen., Dept. of Justice, Kendall L. Vick, Donald B. Ensenat, Asst. Attys. Gen., Barbara S. Bruckner, Staff Atty., New Orleans, La., for Hardy and Edwards.

Bruce C. Reed, Metairie, La., for First Congressional Dist.

Thomas M. McBride, III, Chalmette, La., for John R. Rowley.

Jerald N. Andry, Gilbert V. Andry, III, Gibson Tucker, Jr., New Orleans, La., for plaintiffs-appellees.